**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| TARA M. KULWICKI, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COBB HOSPITAL, INC., a/k/a WELLSTAR COBB HOSPITAL, INC., and WELLSTAR HEALTH SYSTEM, INC.<br><br>Defendants. | Civil Action No. 1:24-CV-4658-MLB-CCB<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

# SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff, Tara M. Kulwicki, by undersigned counsel, files this Second Amended Class Action Complaint. Plaintiff, a lesbian woman, brings this action alleging that Defendants Cobb Hospital, Inc. and Wellstar Health System, Inc. (together, "Defendants") violated Title VII of the Civil Rights Act of 1964 by discriminating against her and similarly situated individuals on the basis of sex. Specifically, Plaintiff alleges that Defendants' health plan imposes heightened requirements on lesbians to establish infertility that the health plan does not impose on heterosexual women nor heterosexual men. In support of her claims, Plaintiff makes the following allegations.

## I. Jurisdiction

1. The jurisdiction of this Court is invoked pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(3), as amended by the Civil Rights Act of 1991, and 42 U.S.C. § 1331.

## II. Venue

2. Venue is proper in the Northern District of Georgia, in that this action arises out of events that occurred in Cobb County. Defendants are subject to personal jurisdiction in Georgia because both are citizens of Georgia and have their principal places of businesses here.

## III. Administrative Exhaustion

3. Plaintiff has satisfied all the procedural and administrative requirements set forth in Section 706 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, as amended, and in particular:

a. Plaintiff, individually and on behalf of those similarly situated, filed a timely Charge of Discrimination against Defendants with the Equal Employment Opportunity Commission (EEOC) on September 16, 2021.

b. Plaintiff received a Notice of Right to Sue from the EEOC dated July 17, 2024, and this action was filed with this Court within 90 days of receipt of that Notice.

4. The EEOC investigated Plaintiff's allegations and concluded that Defendants' actions were discriminatory on the basis of Plaintiff's sex. The EEOC's Determination is attached as Exhibit A.

## IV. Parties

5. Plaintiff, Tara M. Kulwicki, is an individual who resides at 2507 Nowlin Circle, Acworth, GA 30102.

6. Defendant, Cobb Hospital, Inc., a/k/a Wellstar Cobb Hospital, Inc., ("Cobb") is a medical hospital that is part of Defendant, Wellstar Health System, Inc., with a principal place of business located at 3950 Austell Road, Austell, GA, 30106-1174. At all times relevant hereto, Defendant Cobb was an "employer" within the meaning of 42 U.S.C. § 2000e(b).

7. Defendant, Wellstar Health System, Inc. ("Wellstar") is a health system, with a principal place of business located at 793 Sawyer Road, Marietta, GA 30062. At all times relevant hereto, Defendant Wellstar was an "employer" within the meaning of 42 U.S.C. § 2000e(b).

8. Defendant Cobb and Defendant Wellstar were joint employers.

## V. <u>Factual Background</u>

9. Plaintiff Kulwicki is a lesbian woman.

10. Defendants Cobb and Wellstar were and are joint employers of Plaintiff, as they exerted significant control over Plaintiff and class members; shared the authority to hire and fire employees; shared the authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; shared day-to-day supervision, including employee discipline; and shared control of employee records.

11. On February 19, 2019, Kulwicki started working for Defendants as a Registered Nurse and enrolled in their Medical Plan (the "Medical Plan" or the "Plan"). A true and correct copy of the Medical Plan is attached as Exhibit B.

12. During Kulwicki's employment by Defendants, Kulwicki wanted to have a child by pregnancy.

13. As a lesbian, Kulwicki cannot conceive a child by engaging in sexual intercourse. Kulwicki, like other lesbians, can nonetheless become pregnant with fertility treatments.

14. Defendants' Medical Plan offers coverage for an arrangement of infertility benefits and fertility treatments, including Basic Infertility Expenses ("BIS"), Comprehensive Infertility Services ("CIS") and Advanced Reproductive Technology ("ART").

15. CIS includes "ovulation induction with menotropin" and intrauterine insemination ("IUI").

16. If CIS treatments do not result in a pregnancy, covered individuals may receive authorization for ART, which includes more advanced treatments like in vitro fertilization ("IVF"), zygote intrafallopian transfer ("ZIFT"); and gamete intra-fallopian transfer ("GIFT").

17. IUI or IVF are generally considered the primary fertility treatment options for lesbian women like Kulwicki.[1]

18. Under Defendants' Medical Plan, infertility expenses are generally covered for plan members if the expenses involve "charges made by a physician to diagnose and to surgically treat the underlying medical cause of infertility."

---

[1] Colo. Ctr. for Repro. Med., *Lesbian Pregnancy Options for Same-Sex Female Couples*, https://www.ccrmivf.com/lesbian-couple-family-building/ (last visited Sep. 22, 2025).

19. Men do not need to meet any specific definition of "infertility" to qualify for coverage of fertility treatments and expenses under the language of the Medical Plan.

20. Women's infertility expenses, however, are only covered under the Medical Plan if they can first demonstrate that they meet the Medical Plan's definition of "infertile," which they can only do by either (1) engaging in several months of unprotected heterosexual sexual intercourse, or (2) paying out-of-pocket for several cycles of artificial insemination.

21. Specifically, under the Medical Plan:

a. A woman who is under 35 years of age can establish infertility if she is unable to get pregnant after "1 year or more of timed, unprotected coitus,[2] or 12 cycles of artificial insemination."

b. A woman who is 35 years of age or older can establish her infertility if she is unable to get pregnant after "6 months or more of timed, unprotected coitus, or 6 cycles of artificial insemination."

[2] Though the Medical Plan does not explicitly define "coitus," in context, the term clearly means sexual union between a man and a woman, as this is the only sexual activity that can lead to a pregnancy. This would be consistent with the dictionary definition of "coitus" as "sexual contact involving penetration of the vagina by the penis." *Coitus*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/coitus (last visited Sep. 22, 2025).

22. Kulwicki sought precertification from the Medical Plan for CIS benefits (which include IUI treatments) so that she could conceive. On July 27, 2021, Defendants' health plan denied Kulwicki access to fertility benefits because she did not meet the plan's definition of infertility.

23. However, Kulwicki cannot meet the plan's definition of infertility by having "timed, unprotected heterosexual coitus" because she is a lesbian woman. Instead, she can only gain access to fertility treatment benefits under the Medical Plan by first paying significant out-of-pocket costs for at least six cycles of artificial insemination treatments.

24. Kulwicki filed appeals and communicated to the administrators of Defendants' Medical Plan that she could not engage in heterosexual coitus due to her sexual orientation, and that the Medical Plan therefore discriminated against her. Defendants' Medical Plan denied the appeals.

25. Defendants' actions discriminated against Plaintiff Kulwicki on the basis of her sexual orientation, and, by extension, on the basis of sex. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 649 (2020). Specifically, Defendants intentionally discriminated against lesbian women by excluding them from a cost-free method of demonstrating they meet the definition of infertility.

26. For example, heterosexual women have the option of establishing that they meet the Medical Plan's definition of infertility by engaging in, and thereby

qualify for at least CIS treatments, without incurring out-of-pocket expenses for six cycles of artificial insemination.

27. Heterosexual men (in fact, *any* men) are not required to meet *any* such "definition" before gaining access to infertility treatments. At most, the only barrier or burden that the language of the Medical Plan suggests for men is that a heterosexual man and his female partner might be required to tell a medical professional they have engaged in six or twelve months of timed, unprotected heterosexual intercourse to establish the female partner's eligibility for treatment.

28. However, women who cannot engage in unprotected heterosexual intercourse, *i.e.*, lesbian women, are not able to meet this definition. Instead, these individuals must first incur significant out-of-pocket costs to cover at least six cycles of artificial insemination before they can qualify for CIS and/or ART benefits under the Medical Plan.

29. The Medical Plan therefore imposes a barrier on the basis of Kulwicki's sex (and sexual orientation, which is intrinsically linked to sex). Neither a heterosexual man nor a heterosexual woman would be subject to the same out-of-pocket costs to receive infertility benefits.

30. Defendants could have chosen to offer a Medical Plan that made CIS or ART treatments, and other fertility treatment benefits, available to Plan Holders without first requiring all female Plan Holders, including lesbian women, to meet

the "medical definition of infertility" by engaging in six months of timed, unprotected heterosexual intercourse.

31. Alternatively, Defendants could have chosen to offer a Medical Plan that utilized a different, nondiscriminatory definition of infertility that allowed lesbian women a method to access fertility treatments without incurring out-of-pocket expenses first.

32. Instead, Defendants' Medical Plan discriminates against lesbian female employees on the basis of sex (both by nature of their sexual orientation, and by punishing them for failing to conform to a sex stereotype).

33. Defendants engaged in sex discrimination against a class of lesbian employees in violation of Title VII, as amended.

34. Defendants' discriminatory plan design and denials delayed Kulwicki's efforts to get pregnant and caused Kulwicki to spend tens of thousands of dollars out of her own pocket that she otherwise would not have had to spend.

35. After being denied precertification for CIS benefits by Defendants' Medical Plan, Kulwicki was forced to personally incur the costs of fertility treatments, including IUI and IVF, to further her efforts to conceive.

36. At least some, if not all, of Kulwicki's expenses would have been covered by the Medical Plan but for Defendants' discriminatory design and application of the Medical Plan.

37. Kulwicki endured great emotional distress as of result of being denied the benefits of the Medical Plan and thereby having to choose a course of treatment based on cost, rather than based on her personal and medical circumstances in consultation with her doctor. Had Defendants covered the costs for IUI and IVF for Kulwicki as she initially requested, she would not have been forced to delay her personal decision to have a child.

38. **Class Definition:** Plaintiff brings this action as a class action under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, seeking declaratory relief and damages on behalf of the following class of individuals:

> All lesbian individuals who were employed by Defendants and covered by their Medical Plan, submitted a claim or precertification request for infertility treatment benefits and were denied for failing to satisfy the Medical Plan's definition of "infertility"; or paid out-of-pocket for infertility treatment knowing they would be denied benefits for the same reason; or will submit and be denied benefits, or pay out-of-pocket, for infertility treatment.

39. The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) persons who properly execute and file a timely request for exclusion from the Class; (3) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (4) Plaintiff's counsel and Defendants' counsel; and (5) the legal representatives, successors, and assigns of any such excluded persons.

40. **Numerosity:** The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder is impracticable. Defendants have tens of thousands of employees at any given time. Upon information and belief, because of Defendants' discriminatory Medical Plan, a sufficient number of these individuals will be within the class definition to meet the numerosity requirement. The alleged Class is therefore sufficiently numerous.

41. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a. Whether the Medical Plan discriminates on the basis of sex, which includes discrimination based on sexual orientation.

b. Whether Plaintiff and putative class members were excluded from participation in, denied the benefits of, or subjected to discrimination under Defendants' Medical Plans while seeking infertility treatment benefits.

c. Whether Defendants' policies and practices regarding disbursement of infertility treatment benefits under their Medical Plan constitute disparate treatment of Plaintiff and the putative class.

d. Whether Defendants' policies and practices regarding disbursement of infertility treatment benefits under their Medical Plan has resulted in, or will result in, a disparate impact on Plaintiff and the putative class.

e. Whether, as a result of Defendants' policies and practices regarding disbursement of infertility treatment benefits under their Medical Plan, Plaintiff and the putative Class are entitled to equitable, injunctive, and/or declaratory relief, and, if so, the nature of such.

f. Whether Plaintiff and members of the putative class are entitled to receive monetary damages as relief for their financial losses and emotional harm.

42. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

43. **Superiority:** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this dispute and joinder of all members of the Class is impracticable.

The damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in their Complaints. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

44. **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Class, making final declaratory relief appropriate.

**Count I**
**Title VII – Sex Discrimination – Disparate Treatment**

45. Plaintiff incorporates by reference the allegations in Paragraphs 1 to 44, as if fully restated herein.

46. Plaintiff and Class Members are or were Defendants' employees and participants in Defendants' Medical Plan within the applicable statute of limitations.

47. On June 15, 2020, the Supreme Court of the United States issued its decision in *Bostock v. Clayton County*, holding that Title VII's protection against discrimination on the basis of sex also protects against discrimination based on sexual orientation, as "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660. The holding in *Bostock*, *i.e.*, that discrimination under Title VII "on the basis of sex" includes discrimination on the basis of sexual orientation, applies analogously to discrimination "on the basis of sex."

48. Defendants intentionally denied Plaintiff and Class Members a term or condition of their employment because of their sexual orientation in violation of Title VII of the Civil Rights Act of 1944, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991.

49. Specifically, Defendants intentionally discriminate on the basis of sexual orientation by providing, under the express terms of their Medical Plan, stricter prerequisites to obtaining insurance benefits for fertility treatments for

Plaintiff and the putative Class than it does for men or heterosexual women. Defendants' Medical Plan explicitly conditions access to fertility treatment benefits on meeting a particular "medical definition of infertility" that advantages men and heterosexual women by making it impossible for lesbians to meet the definition of "infertile" without first paying out-of-pocket for a requisite number of artificial insemination cycles. A heterosexual man (indeed, any man) has no prerequisites to receiving fertility treatments, and a heterosexual woman can simply tell a medical professional she has attempted to achieve pregnancy through "timed, unprotected" heterosexual intercourse for a requisite number of months rather than paying out-of-pocket for a requisite number of artificial insemination cycles. Defendants' policy therefore constitutes facial disparate treatment discrimination in violation of Title VII or, at a minimum, evidence of Defendants' policy or practice of intentional disparate treatment discrimination, on the basis of sex (and sexual orientation).

50. Just as the Supreme Court held in *Bostock*, that "[b]y discriminating against homosexuals, the [defendant] intentionally penalizes men for being attracted to men and women for being attracted to women," so too does Defendants' Medical Plan penalize Plaintiff and the putative Class, because of their sexual orientation. *Bostock*, 590 U.S. at 664, 669.

51. As a direct result of Defendants' violations of Plaintiff and Class Member's rights under federal law, Plaintiff and Class Members suffered emotional distress and financial losses.

52. Defendants' actions were taken intentionally with malice or reckless indifference to Plaintiff's and Class Members' federally protected rights.

53. Plaintiff and Class Members are entitled to and seek compensatory and punitive damages, declaratory and injunctive relief, reasonable attorneys' fees, costs, and all other remedies available to them under the applicable laws.

**Count II**
**Title VII – Sex Discrimination – Disparate Impact**

54. Plaintiff incorporates by reference the allegations in Paragraphs 1 to 44, as if fully restated herein.

55. Plaintiff and Class Members are or were participants in Defendants' Medical Plan within the applicable statute of limitations.

56. On June 15, 2020, the Supreme Court of the United States issued its decision in *Bostock v. Clayton County*, holding that Title VII's protection against discrimination on the basis of sex also protects against discrimination based on sexual orientation, as "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660. The holding in *Bostock*, *i.e.*, that discrimination

under Title VII "on the basis of sex" includes discrimination on the basis of sexual orientation, applies analogously to discrimination "on the basis of sex."

57. Defendants denied Plaintiff and Class Members a term or condition of their employment because of their sexual orientation in violation of Title VII of the Civil Rights Act of 1944, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991.

58. In the alternative to Count I, and to the extent Defendants deny the existence of a facially discriminatory policy on the basis of sexual orientation against Plaintiff and the putative Class, Plaintiff and the Class allege that Defendants' policy, even if facially neutral as to their sexual orientation, has (or had) an illegal and discriminatorily disparate impact on Plaintiff and the numerous members of the putative Class, all of whom are lesbians, without any business necessity.

59. Defendants' Medical Plan's adverse impact against lesbians stems from the Medical Plan's utilization of a "medical definition of infertility" that makes it impossible for lesbians to qualify for coverage of fertility treatment benefits such as IUI and IVF without first paying out-of-pocket for a requisite number of artificial insemination cycles. The Medical Plan, to the extent it is not facially and intentionally discriminatory against lesbians, is therefore a policy that adversely and disparately impacts Plaintiff and the class of lesbians because of their sex (and sexual orientation) when compared to men and heterosexual women.

60. In short, under the terms of the Medical Plan, zero lesbians are able to receive fertility treatment benefits without incurring significant out-of-pocket costs, whereas heterosexual women *are* able to access fertility treatment benefits at no cost.

61. Just as the Supreme Court held in *Bostock*, that "[b]y discriminating against homosexuals, the [defendant] intentionally penalizes men for being attracted to men and women for being attracted to women," so too does Defendants' Medical Plan penalize Plaintiff and the putative Class, because of their sexual orientation. *Bostock*, 590 U.S. at 664, 669.

62. As a direct result of Defendants' violations of Plaintiff's and Class Member's rights under federal law, Plaintiff and Class Members suffered emotional distress and financial losses.

63. Plaintiff and Class Members are entitled to and seek compensatory and punitive damages, declaratory and injunctive relief, reasonable attorneys' fees, costs, and all other remedies available to them under the applicable laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, demands judgment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991 as follows:

a. That the Court enter a judgment declaring Defendants' actions to be unlawful and in violation of the Title VII of the Civil Rights Act of 1964, as amended;

b. That Defendants be required to compensate Plaintiff and Class Members for the full value of benefits they would have received had it not been for Defendants' discrimination;

c. That Plaintiff and Class Members be awarded compensatory damages in an amount to be determined at trial;

d. That Plaintiff and Class Members be awarded punitive damages in an amount to be determined at trial

e. That Defendants be enjoined from discriminating or retaliating against Plaintiff and Class Members in any manner prohibited by Title VII;

f. That Plaintiff and Class Members be awarded against Defendants the costs and expenses of this litigation, including reasonable attorneys' fees; and

g. That Plaintiff and Class Members be granted such further legal and equitable relief as the Court may deem just and proper.

Plaintiff demands trial by jury.

Dated: September 22, 2025

Respectfully submitted:

*<u>/s/ Gary F. Lynch</u>*
Gary F. Lynch (*p.h.v.*)
Jamisen Etzel (*p.h.v.*)
**LYNCH CARPENTER, LLP**
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15232
Tel.: (412) 322-9243
Fax: (412) 231-0246

gary@lcllp.com
jamisen@lcllp.com

MaryBeth V. Gibson
Georgia Bar No. 725843
**GIBSON CONSUMER LAW GROUP, LLC**
4729 Roswell Road, Suite 208-108
Atlanta, GA 30342
Tel.: (678) 642-2503
marybeth@gibsonconsumerlawgroup.com

Colleen E. Ramage (*p.h.v.*)
**RAMAGE LYKOS, LLC**
525 William Penn Place, 28th Floor
Pittsburgh, PA 15232
Tel.: (412) 325-7700
Fax: (412) 325-7755
cramage@ramagelykos.law

*Attorneys for Plaintiff*