**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| TARA M. KULWICKI, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COBB HOSPITAL, INC., a/k/a WELLSTAR COBB HOSPITAL, INC., and WELLSTAR HEALTH SYSTEM, INC.,<br><br>Defendants. | Civil Action No. 1:24-CV-4658-MLB-CCB<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiff, Tara M. Kulwicki, by and through undersigned counsel, files this response in opposition to the motion to dismiss Plaintiff's Second Amended Class Action Complaint ("SAC") filed by Defendants Wellstar Health System, Inc. and Cobb Hospital, Inc. (Dkt. No. 47). Plaintiff alleges that Defendants' health plan unlawfully imposed barriers on lesbian women prior to receiving fertility benefits—barriers that were not imposed on men nor heterosexual women. This is discrimination because of sex, and Plaintiff states cognizable claims under Title VII. Accordingly, Defendants' Motion to Dismiss should be denied.

## STATEMENT OF FACTS

Plaintiff is a registered nurse who began working for Defendants Cobb Hospital, Inc. and Wellstar Health System, Inc. on February 19, 2019. SAC ¶ 11 (Dkt. No. 46). Plaintiff enrolled in the Defendants' employee medical benefits plan ("the Medical Plan" or "the Plan"), which provided insurance coverage for the costs of certain medical services. SAC ¶¶ 11, 14. For example, for people seeking medical assistance with becoming pregnant, the Medical Plan offers coverage for an array of infertility benefits and fertility treatments, including Basic Infertility Expenses ("BIS") and Comprehensive Infertility Services ("CIS"). SAC ¶ 14. CIS includes "ovulation induction with menotropins" and intrauterine insemination ("IUI"), and, if CIS treatments do not result in pregnancy, Plan Holders may also receive coverage for Advanced Reproductive Technology ("ART"), which covers more advanced

treatments like in vitro fertilization ("IVF"). SAC ¶ 16. As lesbian women cannot become pregnant through heterosexual intercourse, treatments like IUI or IVF are commonly used as fertility treatments for lesbians. SAC ¶¶ 13, 17.

To obtain coverage for fertility treatments and expenses under the Medical Plan, men do not need to meet any specific definition of "infertility" or get any sort of precertification prior to receiving coverage. SAC ¶¶ 18–19. Women's infertility expenses, however, are only covered under the Medical Plan if they can first demonstrate that they meet the Medical Plan's definition of "infertile," which they can only do by either (1) engaging in several months of unprotected heterosexual sexual intercourse, or (2) paying out-of-pocket for several cycles of artificial insemination. SAC ¶ 20. The Medical Plan specifically defines "infertility" for women under 35 years of age as being unable to conceive after "1 year or more of timed, unprotected coitus, or 12 cycles of artificial insemination," or for women 35 and older, being unable to conceive after "6 months or more of timed, unprotected coitus, or 6 cycles of artificial insemination." SAC ¶ 21.

Plaintiff is a lesbian woman who wanted to have a child through pregnancy. SAC ¶¶ 9, 12. Because she does not engage in heterosexual intercourse, her effort to become pregnant necessarily required some of the fertility services provided under the Medical Plan, including, at a minimum, IUI treatments. SAC ¶¶ 12, 13, 17. Plaintiff sought precertification from the Medical Plan for CIS benefits (including

IUI) but was denied by the health plan in July 2021 because she did not meet the Medical Plan's definition of infertile. SAC ¶ 22. However, Plaintiff could not meet the plan's definition of infertility by having "timed, unprotected heterosexual coitus" because she is a lesbian woman, and instead could only meet the definition by first paying significant out-of-pocket costs for at least six cycles of artificial insemination treatments. SAC ¶ 23. Plaintiff appealed the denial of benefits, emphasizing that she could not satisfy the condition of having six months of unprotected coitus due to her sexual orientation, but her appeals were denied. SAC ¶ 24.

As a result of the denial of coverage, Plaintiff was forced to personally spend tens of thousands of dollars on fertility treatments (including IUI and IVF), and her efforts to get pregnant were delayed. SAC ¶¶ 34–35. Some, if not all, of Plaintiff's costs would have been covered but for the Medical Plan's discrimination against her as a lesbian woman. SAC ¶ 36. Plaintiff also suffered great emotional distress as a result of being denied the benefits of the Medical Plan, as she was forced to choose a course of treatment based on out-of-pocket cost rather than her personal and medical circumstances in consultation with her doctor. SAC ¶ 37.

Plaintiff timely filed a charge of discrimination against Defendants with the Equal Employment Opportunity Commission ("EEOC") on September 16, 2021. SAC ¶ 3(a). The EEOC investigated Plaintiff's allegations and concluded that Defendants denied benefits to Plaintiff because of her sex, in violation of Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"). SAC ¶ 4; *see* Dkt. No. 46-1 (EEOC Determination Letter) at 2–3. As the EEOC explained in its Determination Letter:

> Women in heterosexual relationships can meet the [Medical Plan's] criterion for infertility without incurring out-of-pocket expenses for artificial insemination. However, women who do not conform to traditional stereotypes associated with reproduction, including, for example, lesbians, cannot. This category of women must pay for what is made available to other women for free. The evidence thus established that [Defendants'] health care policy discriminates against lesbian employees on the basis of sex (female-sexual orientation and sex-stereotyping).

Dkt. No. 46-1 at 2. Plaintiff received a Notice of Right to Sue from the EEOC on July 17, 2024, and timely filed her initial complaint in this Court within 90 days of receipt of that Notice. SAC ¶ 3(b).

Plaintiff now brings this suit on behalf of herself and a class of similarly situated lesbian employees alleging that Defendants' Medical Plan is facially discriminatory because it intentionally discriminates "on the basis of sex" in violation of Title VII and *Bostock v. Clayton County*, 590 U.S. 644 (2020). SAC ¶¶ 45–53. Alternatively, Plaintiff alleges that the Medical Plan had a discriminatory disparate impact on Plaintiff and the putative Class because the Medical Plan's design makes it impossible for lesbian women to qualify for fertility treatment coverage without first paying significant money out-of-pocket, while men and non-lesbian women do not face that barrier in accessing coverage. *See* SAC ¶¶ 54–63.

## LEGAL STANDARD

In ruling on a defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In reviewing such a motion, the Court must take the allegations of the complaint as true and must construe those allegations in the light most favorable to the plaintiff. *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (per curiam).

## ARGUMENT

### I. Plaintiff Pleads a Cognizable Claim Under Title VII and *Bostock*.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to:

> discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). In *Bostock v. Clayton County*, the Supreme Court held that discrimination based on an employee's sexual orientation is necessarily

discrimination on the basis of sex and therefore violates Title VII. *Bostock*, 590 U.S. at 662.

Defendants' discrimination against Plaintiff (and other lesbians) by erecting barriers to fertility coverage under the Medical Plan is therefore discrimination on the basis of sex and a cognizable violation of Title VII. Defendants' arguments to the contrary misstate the law and ignore key allegations in the complaint, and should be rejected.

**A. *Bostock* is clear: any discrimination based on sexual orientation is discrimination on the basis of sex.**

*Bostock* sets forth a straightforward holding with no loopholes: "For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex." 590 U.S. at 662. As the Supreme Court emphasized, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660.

Here, Defendants' Medical Plan discriminated against Plaintiff for being homosexual. The only way that Plaintiff could access fertility benefits was paying out of pocket for at least six cycles of IUI treatments, in contrast to the cost-free access to fertility benefits offered to heterosexual women and men. SAC ¶¶ 18–21. This is discrimination because of sex in violation of Title VII. *See* 590 U.S. at 669 ("[D]iscrimination based on homosexuality or transgender status necessarily entails

discrimination based on sex; the first cannot happen without the second."); *see also Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 682 (1983) (holding that "[h]ealth insurance and other fringe benefits are 'compensation, terms, conditions, or privileges of employment'" under Title VII). No further analysis is required.

Defendants attempt to both overcomplicate the plain language of *Bostock* and limit its import, suggesting that discrimination based on sexual orientation is *not* always discrimination based on sex. *See* MTD at 2. Defendants assert that applying *Bostock* requires courts to "flip" the sex of a plaintiff in *every* sexual orientation discrimination case to determine whether the alleged discrimination was in fact discrimination "on the basis of sex." *Id.* But this is an erroneous reading of *Bostock*. In *Bostock*, the Court offered the hypothetical of flipping a plaintiff's sex to help demonstrate *why* sexual orientation is necessarily sex discrimination:

> Consider, *for example*, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge.

*Bostock*, 590 U.S. at 660 (emphasis added). Nothing in this example should be taken to limit the actual holding of *Bostock*, *i.e.*, "discrimination based on homosexuality

or transgender status necessarily entails discrimination based on sex." *See* 590 U.S. at 669.

### B. Plaintiff pleads a cognizable claim even under the "but-for" sex-flip test, and neither *Lange* nor *Skrmetti* alter that conclusion.

Despite *Bostock*'s plain language, Defendants nonetheless assert that under the Supreme Court's decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), and the Eleventh Circuit's decision in *Lange v. Houston Cnty., Georgia*, No. 22-13626, 2025 WL 2602633 (11th Cir. Sept. 9, 2025), courts must "not assume that any allegation of discrimination based on homosexuality constitutes a violation of Title VII." MTD at 2. Defendants further claim that these cases foreclose the applicability of Title VII here because applying the "but-for" test allegedly shows that "Plaintiff would not be in a better position if her sex was changed from female to male." MTD at 3–4. But these arguments fundamentally misapply *Skrmetti* and *Lange*, and ignore the allegations in the complaint.

First and foremost, even if the Court applies the alleged "but-for test" from *Bostock*'s demonstrative example, the conclusion is the same: Defendants' Medical Plan discriminates on the basis of sex in violation of Title VII. As set forth in the complaint, the Medical Plan covers a wide array of fertility treatments for both men and women. SAC ¶ 14. Under the terms of the Medical Plan, men do not need to meet any specific definition of "infertility" nor seek precertification prior to receiving coverage. SAC ¶¶ 18–19. Women, however, are only eligible for fertility

treatment coverage if they establish that they are infertile, either by several months of unprotected sexual intercourse with a man or by paying out-of-pocket for several cycles of artificial insemination. SAC ¶ 20. Lesbian women cannot engage in the former (unprotected sexual intercourse with a man) and must therefore pay out-of-pocket for artificial insemination to be eligible for fertility coverage. SAC ¶¶ 17, 28. If a lesbian woman's sex is "flipped" and she becomes a man, however, the barrier to accessing fertility benefits disappears. SAC ¶¶ 18–19. This discrepancy "immediately spots the discrimination," and Plaintiff need not jump through any more hoops to demonstrate that the policy at issue here is sex discrimination in violation of Title VII. *Bostock*, 590 U.S. at 672.

Second, *Skrmetti* is fundamentally inapplicable here. *Skrmetti* addressed the constitutionality of a prohibition on transgender medical care for minors under the Equal Protection Clause. 145 S. Ct. at 1824. In its reasoning, the Court rejected the import of *Bostock* to those circumstances and explicitly stated that "[w]e have not yet considered whether *Bostock*'s reasoning reaches beyond the Title VII context, and we need not do so here." 145 S. Ct. at 1834. Any analysis of *Bostock* in that opinion was thus *dicta*, and has little import in this Title VII case.

Third and finally, although *Lange* was a Title VII case, that decision addressed fundamentally distinct circumstances and should not be used to unilaterally foreclose the applicability of Title VII here. In *Lange*, the Eleventh Circuit held that a health

insurance policy prohibiting sex change treatments did not discriminate on the basis of sex. 2025 WL 2602633, at *5. Defendants claim that this holding demonstrates that sex is similarly "not the but-for cause" here, if the Court applies the so-called "but-for" *Bostock* test. *See* MTD at 5. But this comparison quickly falls apart. In *Lange*, the issue was *not* that transgender individuals were prevented from accessing treatments available to non-transgender individuals, which would be more akin to the fertility treatment barriers imposed on lesbians in this case. Rather, *Lange* involved a policy that prevented *any* individual from accessing certain types of coverage:

> The County's plan does not facially discriminate based on transgender status. Like the law at issue in *Skrmetti*, the County's policy is a "classification based on medical use." *The plan does not say, for example, that transgender employees must pay more than nontransgender employees or that transgender employees or their dependents receive reduced benefits*. Instead, as we have already explained, the County's plan would cover the procedures that make up a sex change for other purposes, such as treatment for cancer or reconstructive surgery following a car accident, whether or not the employee who needed those procedures was transgender.

*Lange*, 2025 WL 2602633, at *5 (citations omitted and emphasis added). Here, by contrast, Defendants' Medical Plan is the specific exception that the Eleventh Circuit contemplated in *Lange* (*i.e.*, requiring employees in the protected class to pay more than employees outside the protected class), as the Plan requires lesbian employees to pay more than male or heterosexual female employees to receive the same access to fertility benefits. *Cf.* 2025 WL 2602633, at *5; SAC ¶ 14. This is discrimination

based on Plaintiff's sexual orientation and her sex, in stark contrast to a situation where "neither the plaintiff's sex nor [her] transgender status is the but-for cause of [her] inability to obtain [a] prohibited treatment." *Lange*, 2025 WL 2602633, at *5 (quoting *Skrmetti*, 145 S. Ct. at 1834). In sum, *Lange* does not place Defendants' discrimination outside of Title VII's purview, and, if anything, lends support for the Court finding that Defendants' conduct ran afoul of Title VII's workplace protections.

## II. Plaintiff States a Viable Disparate Treatment Claim.

Applying these principles from *Bostock*, Defendants' Medical Plan is facially discriminatory against lesbian women, and Plaintiff states a plausible disparate treatment claim under Title VII.

Facial discrimination under Title VII "occurs when an employer adopts a policy that explicitly treats some employees differently from others" based on their membership in a protected class. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994). As set forth in *Bostock*, a policy that treats employees differently based on sexual orientation constitutes facially discriminatory disparate treatment in violation of Title VII. *Bostock*, 590 U.S. at 660.

When a health insurance policy imposes a heightened burden on same-sex individuals seeking fertility benefits, such a policy is facially discriminatory. *See, e.g.*, *Berton v. Aetna Inc.*, No. 23-CV-01849-HSG, 2024 WL 869651, at *4 (N.D.

Cal. Feb. 29, 2024); *Murphy v. Health Care Serv. Corp.*, No. 22-CV-2656, 2023 WL 6847105, at *4 (N.D. Ill. Oct. 17, 2023). In *Berton*, the health insurance policy "allow[ed] individuals in heterosexual partnerships to show infertility without incurring any out-of-pocket costs, because they have the option of doing so through 'frequent sexual intercourse'" whereas "same-sex partners ha[d] only one way to demonstrate infertility: they must go through expensive cycles of donor insemination, for which they are required to provide verifiable proof." 2024 WL 869651, at *4. The court found that such allegations were sufficient to show that the policy provided "differential treatment on the basis of sexual orientation" and was "facially discriminatory[,] because it impose[d] an unequal burden on same-sex couples as compared to opposite-sex couples. *See id.* (citing *Frank v. United Airlines, Inc.*, 216 F.3d 845, 854 (9th Cir. 2000)). Similarly, in *Murphy*, the court found that the plaintiff "adequately alleged that the [health insurance] policy discriminates against those people based only on their sexual orientation" because the policy allowed a woman in a heterosexual relationship to "qualify for infertility treatment *without incurring any monetary costs*" while a woman in a same-sex relationship was "forced to pay for one year of medically supervised methods of conception to qualify for interfertility treatment because her sexual orientation forecloses the other options to her." *Murphy*, 2023 WL 6847105, at *4 (emphasis added).

Likewise here, Defendants' Medical Plan was facially discriminatory toward lesbian women. The Medical Plan offered coverage for a wide array of fertility treatments for both men and women. SAC ¶ 14. But the Medical Plan required lesbian women to pay out-of-pocket for a minimum of six cycles of IUI before they were eligible for fertility benefits under the Plan. SAC ¶¶ 17, 20, 28. Heterosexual women, however, could demonstrate their eligibility for fertility benefits simply by affirming that they had unprotected sexual intercourse with a man for several months and were unable to conceive. SAC ¶ 20. And heterosexual men (indeed, any man) were eligible for fertility benefits without any pre-eligibility barriers. SAC ¶¶ 18–19. This is facial discrimination against lesbians based on their sexual orientation, *see Berton*, 2024 WL 869651, at *4; *Murphy*, 2023 WL 6847105, at *4, and violates Title VII. *See Bostock*, 590 U.S. at 660, 662. Indeed, as the EEOC found in this case, requiring Plaintiff and other lesbians to "pay for what is made available to other women for free" is unlawful discrimination. Dkt. No. 46-1 at 2.

### A. Defendants' hypothetical examples of non-qualifying heterosexuals do not excuse Defendants' unlawful discrimination.

In an apparent attempt to muddy the discrimination on the face of the Medical Plan, Defendants suggest that Plaintiff's disparate treatment claim must fail because *some* non-lesbian women "may not be able to engage in procreative intercourse," and because Plaintiff allegedly ignores that women with a male partner may nonetheless incur some costs when engaging in procreative sex. Neither of these

arguments, however, has any basis in the law, and cannot excuse the discrimination experienced by lesbian women under the Plan.

First, the fact that a small portion of individuals outside of a protected class may face similar negative effects under a policy is no defense to the discrimination. "Discriminatory laws, policies, or actions will often have negative effects (whether intended or not) on individuals who do not belong to the disfavored group," yet such laws are still discriminatory because "overdiscrimination" and "collateral damage" are not valid defenses. *See Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 (9th Cir. 2013) ("The principle that overdiscrimination is prohibited undergirds all of constitutional and statutory anti-discrimination law, although it often goes unsaid precisely because it is so foundational."). The fact that some heterosexual women under Defendants' medical plan may not be able to demonstrate infertility for free does nothing to diminish the fact that *all lesbians*, including Plaintiff, face such a barrier. Such an argument is particularly misguided in opposition to a disparate treatment claim which, as *Bostock* itself emphasized, focuses on whether an *individual* (like Plaintiff) faced discriminatory treatment in violation of Title VII, rather than the overall effects of an employer's policy at a group level. *See Bostock*, 590 U.S. at 665, 667.

Defendants' discussion of heterosexual employees who incur costs in finding a time and place for sexual intercourse is similarly irrelevant. There is simply no

comparison between the out-of-pocket costs for a lesbian woman to go through six cycles of IUI, which can cost between $500 and $4,000 *per cycle*,[1] and the minor costs of finding a hotel room, finding a babysitter, and taking time off from work. And more importantly, these hypothetical costs faced by a hypothetical heterosexual would not be the result of her *membership in a protected class*, compared to a lesbian woman being forced to pay for IUI due to her sexual orientation and sex.[2]

In sum, despite Defendants' attempt to argue otherwise, Plaintiff need not categorize each of Defendants' employees by all possible combinations of sex and sexual orientation and explain away the rare cases where a heterosexual woman or man may face barriers to receiving fertility benefits under the Plan. At the Rule 12 stage, Plaintiff's burden is merely to demonstrate that Defendants and their Medical Plan erected barriers to receiving an employment benefit on the basis of her sex. She has done so under *Bostock*: if she were a man or a heterosexual woman, the Medical Plan would give her an option to qualify for fertility benefits without paying for six cycles of IUI, but because she is a lesbian, Plaintiff was denied that option and forced

---

[1] *The Cost of IUI*, FertilityIQ, https://www.fertilityiq.com/fertilityiq/iui-or-artificial-insemination/the-cost-of-iui#components-of-iui-cycle-cost (last visited Oct. 20, 2025).

[2] For example, Defendants' hypothetical examples of heterosexuals who do not have the time for regular sexual intercourse, or have a partner overseas, are still given the opportunity to meet the definition without paying for IUI, and the reasons they might not in fact do so are not because of their protected status.

to spend her own money.

This is enough to plead disparate treatment under Title VII, and Defendants' motion to dismiss this claim should be denied.

## III. Plaintiff States a Viable Alternative Claim Based on Disparate Impact.

As explained above, Defendants' Medical Plan facially discriminates against employees on the basis of sexual orientation because it provides differing ways for employees to access fertility benefits based on whether they engage in heterosexual intercourse, or not, and forecloses the cost-free route to non-heterosexuals by requiring them to pay out of pocket for at least six cycles of IUI treatment. If the Court finds that the Medical Plan is facially neutral, however, Plaintiff pleads in the alternative that it nonetheless violates Title VII by disparately impacting lesbian women like Plaintiff.

Disparate impact claims challenge "practices that have a disproportionately adverse effect on [a protected group] and are otherwise unjustified by a legitimate rationale." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 524–25 (2015). In prevailing on a disparate impact theory, an employee does not need to show animus by the employer, *Powers v. Alabama Dep't of Educ.*, 854 F.2d 1285, 1291 (11th Cir. 1988), but simply that a policy or practice falls more harshly on one group than another." *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 587 n.31 (1979). "As the Supreme Court has recognized, some class claims

may be such that they are cognizable under both a disparate treatment and a disparate impact theory." *Powers*, 854 F.2d at 1292 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).

Here, Plaintiff has established that she, like all lesbian women employed by Defendants, cannot obtain coverage for fertility benefits unless they first pay thousands of dollars out-of-pocket for at least six cycles of IUI treatments. In stark contrast, men can obtain coverage for fertility benefits without any such barrier, and non-lesbian women can obtain coverage for free by engaging in unprotected intercourse with a male partner for several months. SAC ¶¶ 18–19. This is disparate treatment under Title VII and *Bostock*, and Defendants' arguments to the contrary misrepresent the law and ignore the allegations of the complaint.

### A. Defendants' Medical Plan is a specific employment policy that has a disparate impact on lesbians in violation of Title VII.

Defendants first assert that Plaintiff's disparate treatment claim must be dismissed because Plaintiff fails to identify any specific policy or practice that has a discriminatory impact on her. This argument ignores the plain contentions in the complaint, and what the law demands.

Plaintiff explicitly states that her claim arises from the Medical Plan's disparate treatment of lesbians, specifically by imposing a cost barrier to accessing fertility treatment that it does not impose on men or heterosexual women:

> Defendants' Medical Plan's adverse impact against lesbians stems from the Medical Plan's utilization of a "medical definition of infertility" that makes it impossible for lesbians to qualify for coverage of fertility treatment benefits such as IUI and IVF without first paying out-of-pocket for a requisite number of artificial insemination cycles. The Medical Plan . . . is therefore a policy that adversely and disparately impacts Plaintiff and the class of lesbians because of their sex (and sexual orientation) when compared to men and heterosexual women.

SAC ¶ 59.

Plaintiff thus specifically identifies the Medical Plan's requirements to access fertility benefits as the "policy or practice" that violates Title VII.[3] No more is required at this stage. *See Stewart v. Bd. of Trs. for Univ. of Alabama Sys.*, No. 2:22-CV-00203-RDP, 2022 WL 17741697, at *3 (N.D. Ala. Dec. 16, 2022) (noting that "[a]t the motion to dismiss stage," the complaint need only "provide the defendant with sufficient notice as to the specific policies challenged."); *Cobb Cnty. v. Bank of Am. Corp.*, No. 1:15-CV-04081-LMM, 2020 WL 13200158, at *4 (N.D. Ga. Sep. 18, 2020) (rejecting defendants' argument that plaintiffs were not sufficiently specific in identifying discriminatory policies, and criticizing defendants' attempt to "add several requirements" when pleading a disparate impact claim that had no support in the statute nor precedent).

---

[3] As set forth above, an employer-sponsored health plan is an employment benefit that is plainly subject to the anti-discrimination protections of Title VII. *See Newport News Shipbuilding*, 462 U.S. at 682; *see also Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984) ("A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion.").

### B. Plaintiff does not need to prove detailed statistical disparities prior to discovery.

Defendants further argue that Plaintiff's disparate treatment claim must fail because Plaintiff does not offer detailed statistics showing disparate treatment to support her claim. MTD at 13–17. That is not the law, particularly at the Rule 12 stage.

"To establish a prima facie disparate impact claim, a plaintiff must show a statistically significant disparity in the treatment of two groups. This is frequently proved through statistics, *but not always*." *Camara v. Epps Air Serv., Inc.*, 292 F. Supp. 3d 1314, 1338 (N.D. Ga. 2017) (emphasis added). "Circumstantial evidence, complemented by judicial notice to show that a facially neutral policy must in the ordinary course have a disparate impact on a protected group of which an individual plaintiff is a member, is often utilized." *Craig v. Ala. State Univ.*, 804 F.2d 682, 687 n.7 (11th Cir. 1986) (quotations and citations omitted). Particularly in Title VII cases, a plaintiff "should be afforded the opportunity of discovery before [s]he is required to present detailed statistics to the court." *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1304 (M.D. Ala. 2019), *aff'd*, 6 F.4th 1247 (11th Cir. 2021) (citing *Forsyth v. Univ. of Ala. Bd. of Trs.*, No. 7:17-CV-00854-RDP, 2018 WL 4517592, at *6 (N.D. Ala. Sept. 20, 2018)). Accordingly, on a motion to dismiss "all [the plaintiff] must do is allege '*some* statistical disparity,

however elementary.'" *Id.* (quoting *Brady v. Livingood*, 360 F. Supp. 2d 94, 100 (D.D.C. 2004)).

Plaintiff has established such a disparity here. All lesbian women, including Plaintiff, are forced to spend thousands of dollars for at least six cycles of artificial insemination to be eligible for fertility treatments under the Medical Plan. Men and non-lesbian women are not subject to such a barrier. SAC ¶¶ 18–20. Even if some hypothetical men and non-lesbian women must spend a small amount of money to access fertility treatment, as Defendants' brief suggests, *see* MTD at 7, there will still be a statistically significant disparity between lesbian women and other employees, as lesbian women must *always* pay out-of-pocket prior to receiving coverage under the Medical Plan. SAC ¶¶ 17, 20, 28. Given this stark disparity, the Court may simply take judicial notice that under the terms of the policy, all non-lesbian employees of Defendants are afforded the opportunity to qualify for fertility benefits under the Medical Plan without paying for six or twelve cycles of IUI, whereas lesbian employees will never have such an option. *See Craig*, 804 F.2d at 687 n.7.

This is enough to establish a discriminatory disparity, and Plaintiff need not "present detailed statistics" until after discovery. *Coral Ridge Ministries Media*, 406 F. Supp. 3d at 1304.

## IV. Defendants' Arguments Against Class Certification Are Premature.

Finally, Defendants devote several pages of their motion to arguments that

Plaintiff's complaint does not satisfy Rule 23's requirements for class certification. MTD at 17–23.

However, Plaintiff's allegations indicating that she intends to seek class certification are not a "claim" and are not subject to dismissal under Rule 12(b)(6), and any attempt to rule on the certifiability of Plaintiff's proposed class is premature. Courts across the Eleventh Circuit routinely find such attempts by defendants to be "premature" as they raise arguments properly "filed in opposition to a motion for class certification." *Snover v. Publix Super Markets, Inc.*, No. 8:15-cv-2434-T-26-AAS, 2016 WL 11581804, at *1 (M.D. Fla. Oct. 24, 2016); *see also Gill-Samuel v. Nova Biomedical Corp.*, 298 F.R.D. 693, 699 (S.D. Fla. 2014) (stating such motions are a "drastic remedy" and viewed "with disfavor"). As another court in this Circuit explained, dismissal of class allegations at the pleading stage "is an extreme remedy appropriate only where . . . it will be impossible to certify the classes alleged by the plaintiff regardless of the facts the plaintiff may be able to prove." *Fitzer v. Am. Inst. of Baking*, No. 2:09-cv-169, 2016 WL 4223612, at *11 (S.D. Ga. Aug. 9, 2016). Plaintiff's complaint alleges a clearly defined class of lesbian women that were all similarly harmed by Defendants and that will satisfy all the requirements of Rule 23. *See* SAC ¶¶ 38–44. Any attempt to dismiss her class allegations at this stage therefore lacks merit.

To the extent that Defendants intended to style their motion as one to strike

the class allegations from the pleadings, such a procedural maneuver is similarly disfavored. Rule 12(f) authorizes courts to strike allegations from a pleading, but only if they are "redundant, immaterial, impertinent, or scandalous." Fed. R. Civ. P. 12(f). But the "striking [of] class allegations at the pleading stage is the functional equivalent of denying class certification," and a court "should not determine the appropriateness of class action treatment at the motion to dismiss stage where the class certification issue cannot be readily resolved by the complaint alone." *Etzel v. Hooters of Am., LLC*, 223 F. Supp. 3d 1306, 1313 (N.D. Ga. 2016) (*citing Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008)). This is particularly so where, as here, nothing in the class allegations is in any way redundant, immaterial, impertinent, or scandalous. *See* Fed. R. Civ. P. 12(f); SAC ¶¶ 38–44.

Put simply, the proper procedure for determining whether certification of a class action is appropriate will be through Plaintiff's presentation of a class certification motion, at which time Defendants will be free to respond and advance arguments in opposition. *See Snover*, 2016 WL 11581804, at *1. Prohibiting Plaintiff from developing class evidence and certification theories at this early stage, and prior to discovery, is not proper under Eleventh Circuit precedent. *See Mills*, 511 F.3d at 1309 (emphasizing that "the parties' pleadings alone are often not sufficient to establish whether class certification is proper, and the district court will need to go beyond the pleadings and permit some discovery and/or an evidentiary

hearing to determine whether a class may be certified"); *Herrera v. JFK Med. Ctr. Ltd. P'ship*, 648 F. App'x 930, 936 (11th Cir. 2016) (holding that district court's decision to strike class allegations without permitting class discovery was an abuse of discretion).

## CONCLUSION

For these reasons, Plaintiff respectfully asks this Court to deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted:

*/s/ Gary F. Lynch*
Gary F. Lynch (*p.h.v.*)
Jamisen Etzel (*p.h.v.*)
**LYNCH CARPENTER, LLP**
1133 Penn Ave.
Pittsburgh, PA 15232
Tel.: (412) 322-9243
Fax: (412) 231-0246
gary@lcllp.com
jamisen@lcllp.com

MaryBeth V. Gibson
Georgia Bar No. 725843
**GIBSON CONSUMER LAW GROUP, LLC**
4729 Roswell Road, Suite 208-108
Atlanta, GA 30342
Tel.: (678) 642-2503
marybeth@gibsonconsumerlawgroup.com

Colleen E. Ramage (*p.h.v.*)
**RAMAGE LYKOS, LLC**
525 William Penn Place, 28th Floor

Pittsburgh, PA 15232
Tel.: (412) 325-7700
Fax: (412) 325-7755
cramage@ramagelykos.law

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2025, I filed the foregoing Plaintiff's Response in Opposition to Defendants' Motion to Dismiss Second Amended Class Action Complaint by electronic filing using CM/ECF, which will automatically send e-mail notification to all counsel of record.

*/s/ Gary F. Lynch*
Gary F. Lynch