**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**TARA M. KULWICKI,**

**Plaintiff,**

**v.**

**COBB HOSPITAL, INC., et al.,**

**Defendants.**

**CIVIL ACTION NO.**
**1:24-CV-4658-MLB-CCB**

**NON-FINAL REPORT AND RECOMMENDATION**

Plaintiff Tara M. Kulwicki brings this action, individually and on behalf of a putative class, against her employers, Defendants Cobb Hospital, Inc., also known as Wellstar Cobb Hospital Inc., and WellStar Health System, Inc., asserting claims of sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. (Title VII). (Doc. 46).

The matter is before the Court for consideration of Defendants' motion to dismiss the second amended complaint. (Doc. 47). Plaintiff filed a response to the motion, (Doc. 48), and Defendants filed a reply, (Doc. 49). For the reasons set forth below, I **RECOMMEND** that Defendants' motion to dismiss, (Doc. 47), be **DENIED.**

## I. BACKGROUND

The Court draws the following factual allegations from the second amended complaint, (Doc. 46), which are assumed to be true for the purpose of this discussion.

Plaintiff, who is a lesbian, was employed by Defendants as a registered nurse and enrolled in their medical plan. (Doc. 46 at ¶¶ 9, 11). Plaintiff wanted to have a child by pregnancy. *Id.* at ¶ 12. As a homosexual woman, however, she cannot engage in heterosexual intercourse (coitus), although she can become pregnant with fertility treatments such as intrauterine insemination (IUI), in vitro fertilization (IVF), or other advanced reproductive technology (ART). *Id*. at ¶¶ 13–17. The medical plan offers coverage for infertility benefits and fertility treatments, including Comprehensive Infertility Services (CIS), which includes IUI, and ART, which includes IVF. *Id*. at ¶¶ 14–18. Infertility expenses are generally covered for plan members if the expenses involve charges made by a physician to diagnose and surgically treat the underlying medical cause of infertility. *Id*. at ¶ 18. Women's infertility expenses are covered only if they meet the plan's definition of "infertile." *Id*. at ¶ 20. The plan defines infertility as a woman under 35 years of age who is unable to get pregnant after 1 year or more of timed, unprotected coitus

or 12 cycles of artificial insemination; or a woman 35 years of age or older who is unable to get pregnant after 6 months or more of timed, unprotected coitus, or 6 cycles of artificial insemination. *Id*. at ¶¶ 20, 21. Men, however, do not need to meet any specific definition of "infertility" to qualify for coverage of fertility treatments. *Id*. at ¶¶ 19, 27.

On July 27, 2021, after Plaintiff sought precertification for CIS benefits, Defendants' medical plan notified her that she was denied access to fertility benefits because she did not meet the criteria under the plan's definition of infertility. *Id*. at ¶ 22. The plan, again, provides two ways to meet the definition of infertile—through an unsuccessful period of coitus or unsuccessful cycles of artificial insemination. *Id.* at ¶ 21. Plaintiff cannot utilize the first method of establishing infertility—through six months or more of timed, unprotected heterosexual coitus—and therefore she is able to obtain access to the medical plan's fertility treatment benefits only by first paying for a series of at least six IUI treatments out of her own pocket. *Id*. at ¶ 23. Heterosexual women have the option to meet the medical plan's definition of infertility without incurring out-of-pocket expenses for six cycles of artificial insemination, and, again, men need not meet any definition of infertility at all. *Id*. at ¶¶ 26, 27.

Plaintiff filed appeals and told the administrators of the medical plan that she could not engage in heterosexual coitus due to her sexual orientation, which she believed constituted discrimination against her, but the medical plan denied the appeals. *Id*. at ¶ 24. After being denied precertification for CIS benefits, Plaintiff was forced to personally incur the costs of fertility treatments, including IUI and IVF, to further her efforts to conceive. *Id*. at ¶ 35. The design of Defendants' medical plan and denials of her claims delayed Plaintiff's efforts to get pregnant, caused her to spend tens of thousands of dollars out of her own pocket that she otherwise would not have had to spend, and caused her great emotional distress. *Id*. at ¶¶ 34–35, 37. At least some of Plaintiff's expenses would have been covered by the medical plan, but for its discriminatory design and application. *Id*. at ¶ 36.

Plaintiff brings her case as a putative class action, based on the following proposed class:

> All lesbian individuals who were employed by Defendants and covered by their Medical Plan, submitted a claim or precertification request for infertility treatment benefits and were denied for failing to satisfy the Medical Plan's definition of "infertility"; or paid out-of-pocket for infertility treatment knowing they would be denied benefits for the same reason; or will submit and be denied benefits, or pay out-of-pocket, for infertility treatment.

*Id*. at ¶ 38. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on September 16, 2021. *Id*. at ¶ 3. She received her notice of right to sue on July 17, 2024. *Id*. Plaintiff brings two counts in the complaint: (1) in Count I, she alleges disparate-treatment sex discrimination under Title VII and, alternatively, (2) in Count II, she alleges disparate-impact sex discrimination under Title VII. *Id*. at ¶¶ 45–63.

## II. MOTION TO DISMISS AND PLAINTIFF'S RESPONSE

Defendants filed a motion to dismiss the second amended complaint under Federal Rule of Civil Procedure 12(b)(6). (Doc. 47). Defendants first argue that, whether pled as a claim for disparate treatment or disparate impact, Plaintiff fails to state a Title VII claim because she cannot meet the "but-for test" set forth in *Bostock v. Clayton County*, 590 U.S. 644 (2020), to determine whether the alleged discrimination based on sexual orientation necessarily entails discrimination based on sex. *Id*. at 1–5. Specifically, Defendants argue that Plaintiff has not alleged a violation of Title VII because after changing Plaintiff's sex under the but-for test, she still would not be eligible for the benefits at issue. *Id*. at 3–5. Defendants contend that, even if Plaintiff is not required to meet the but-for test, she still has not sufficiently alleged that the medical plan treats individuals differently based

on sexual orientation because even heterosexual women may not be able to establish that they meet the plan's definition of infertility by engaging in intercourse or without incurring costs to do so. *Id*. at 5–8. Defendants argue that Plaintiff also fails to state a Title VII claim under a disparate-impact theory because she does not identify any specific employment practice and does not allege any statistical disparity between heterosexual and lesbian women. *Id*. at 8–17. And finally, Defendants argue that Plaintiff has not sufficiently pled the Rule 23 class allegations. *Id*. at 17–23.

In response, Plaintiff argues that *Bostock* is clear that any discrimination based on sexual orientation is discrimination on the basis of sex. (Doc. 48 at 6–9). She argues that, even if the Court applies the alleged but-for test from *Bostock*, her claim survives under that test because Defendants' plan does not require men to meet any specific definition of "infertility" or seek precertification prior to receiving coverage. *Id*. at 9–12. She argues that she has plausibly alleged a disparate-treatment theory because, due to the plan's design, lesbian women do not have an option to qualify for fertility benefits without paying for six cycles of IUI (while heterosexual individuals do have that option available to them—they can engage in coitus). *Id.* at 12–17. Plaintiff contends that she has stated a valid

disparate-impact theory by identifying the discriminatory employment practice (the medical plan's requirements to access fertility benefits) and that she is not required to allege detailed statistical evidence because it is clear that that medical plan, by its terms, will necessarily result in the denial of fertility benefits to all lesbians unless they first pay for at least six cycles of IUI (but will, on its face, afford an alternate opportunity to heterosexual employees). *Id*. at 17–21. Plaintiff argues that Defendants' arguments against class certification are premature. *Id*. at 21–24.

Defendants filed a reply brief, (Doc. 49), and the matter is now before the Court for consideration.

## III. DISCUSSION

### A. Standard on a Motion to Dismiss

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a plaintiff need not include "detailed factual allegations" in the complaint, the requirement to demonstrate the grounds for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In other words, Rule 8 requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Instead, to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

These standards suggest a two-pronged approach for courts evaluating a motion to dismiss a complaint. *See id.* at 678–79; *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010). First, "eliminate any allegations in the complaint that are merely legal conclusions." *Am. Dental Ass'n*, 605 F.3d at 1290. While a court must accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011), it need not consider "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678. Nor should it consider "a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Second, "where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Am. Dental Ass'n*, 605 F.3d at 1290 (internal quotation marks omitted).

**B. Sex Discrimination Claims**

Title VII provides that it is unlawful for an employer "to fail or refuse to hire or to discharge . . . or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . ." 42 U.S.C. § 2000e-2(a)(1). Supreme Court precedent holds that the complaint in an employment discrimination case need not contain specific facts establishing a prima facie case under *McDonnell Douglas*[1] to survive a motion to dismiss. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002). Nevertheless, the Eleventh Circuit has since held that complaints alleging discrimination still must meet the plausibility standard of *Twombly* and *Iqbal*. *See Henderson v. JP Morgan Chase Bank, N.A.*, 436 F. App'x 935, 937 (11th Cir. 2011) (holding that although a complaint in an employment case need not establish a prima facie case to survive a motion to dismiss, it still must satisfy the standards of *Twombly* and *Iqbal*). The complaint must "provide enough factual matter (taken as true) to suggest intentional . . . discrimination." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015) (internal quotation marks omitted). In this case,

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

therefore, Plaintiff must allege sufficient non-conclusory factual matter to state a plausible claim for relief on her claims of sex discrimination under Title VII.

**1. Disparate Treatment**

While Plaintiff need not establish a prima facie case to survive Defendants' motion to dismiss, *see Swierkiewicz*, 534 U.S. at 510–11, it is useful for guidance purposes to note that a plaintiff can establish a prima facie case of disparate-treatment sex discrimination by showing that: (1) Plaintiff was a member of a protected class; (2) Plaintiff was subjected to an adverse employment action; (3) Plaintiff's employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) Plaintiff was qualified for her position. *See, e.g.*, *Burke-Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 (11th Cir. 2006). A plaintiff can establish a convincing mosaic of discrimination by showing "evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (internal quotation marks and alteration omitted).

"Facial discrimination occurs when an employer adopts a policy that explicitly treats some employees differently from others on the basis of" a protected category. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994). And along those lines, Plaintiff alleges, at the most basic level, that the plan treats men differently than women when it comes to fertility benefits. (Doc. 46 at ¶¶ 18–20, 27, 49); *see Newport News Shipbuilding and Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983) (holding that, under Title VII, "[h]ealth insurance and other fringe benefits are compensation, terms, conditions, or privileges of employment" (internal quotation marks omitted)). Specifically, she alleges that the plan generally provides infertility benefits "for plan members" if the expenses involve charges made by a physician to diagnose and to surgically treat the underlying medical cause of infertility. (Doc. 46 at ¶ 18). Men need not meet any definition of "infertility" to qualify for those benefits. *Id.* at ¶ 19. But women must do just that, and to meet it, they have to demonstrate an inability to get pregnant after 6 or 12 months of coitus (depending on age) or 6 or 12 cycles of artificial insemination. *Id.* at ¶¶ 20–21. Those costly, time-consuming requirements apply only to women. *Id.* at ¶ 27 ("Heterosexual men (in fact, *any* men) are not required to meet *any* such

'definition' before gaining access to infertility treatments.").[2] And they apply without regard to the sexual orientation of the plan member. That, it seems, is facial discrimination based on gender, and the analysis could probably end here.

But that is not where the parties spend most of their time in the briefing—the focus on sexual orientation. Plaintiff alleges that Defendants' medical plan has stricter prerequisites to access the plan's fertility treatment benefits for lesbian

---

[2] The only argument I can discern in Defendants' brief countering this seemingly clear difference in how the plan treats men and women is a suggestion that a man would be seeking "benefits different than the benefits to treat female infertility [Plaintiff] contends were discriminatorily denied to her." (Doc. 47 at 4–5). The benefits "discriminatorily denied to her" are presumably the IUI and IVF that she personally incurred the costs for. (Doc. 46 at ¶ 35). But the statement that a man would not be seeking those benefits, which Defendants do not support with a citation to anything, (Doc. 47 at 4–5), is not necessarily a given. *See, e.g.*, WebMD.com Infertility and Men, https://www.webmd.com/infertility-and-reproduction/male-fertility-test ("In some cases where the man has mild infertility, artificial insemination or other assisted reproduction techniques, such as GIFT, ZIFT, or IVF, may be helpful.") (last visited July 10, 2026); Yale Medicine Male Fertility Program, https://www.yalemedicine.org/departments/male-fertility-program ( "If sperm quantity is insufficient for an IUI procedure, or if IUI proves unsuccessful, in vitro fertilization (IVF) may be employed to improve pregnancy success rates. A patient's sperm is combined with their partner's egg in the IVF laboratory. Intracytoplasmic sperm injection (ICSI) is often utilized, in which a single sperm is injected directly into the egg to facilitate fertilization. Subsequently, one of the resulting embryos is transferred into the partner's uterus.") (last visited July 10, 2026). To the extent that Defendants' response to the seemingly different treatment afforded men and women under the plan when it comes to fertility is to say that men just would not be seeking ART like IVF (and I am not entirely sure that is Defendants' argument), I am not persuaded.

employees than it does for heterosexual employees. (Doc. 46 at ¶¶ 25–29, 49). In *Bostock v. Clayton County*, the Supreme Court held that discrimination against an employee because the employee is homosexual constitutes discrimination "because of sex" under Title VII. 590 U.S. 644, 660–62 (2020) ("An individual's homosexuality . . . is not relevant to employment decisions. That's because it is impossible to discriminate against a person for being homosexual . . . without discriminating against that individual based on sex."). In other words: "[j]ust as sex is necessarily a but-for *cause* when an employer discriminates against homosexual . . . employees, an employer who discriminates on these grounds inescapably *intends* to rely on sex in its decisionmaking." *Id.* at 661.

The Supreme Court discussed the "simple" but-for test for determining whether an employer has violated Title VII: "if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Id.* at 659–60. And the Eleventh Circuit has recently applied the *Bostock* but-for test to determine whether a policy that allegedly discriminated on the basis of sexual orientation or transgender status discriminated on the basis of sex such that it was a violation of Title VII:

> The Supreme Court has held that Title VII prohibits employers 'from firing employees on the basis of homosexuality or transgender status'

> when 'discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex.' *Bostock v. Clayton County*, 590 U.S. 644, 669, 680 (2020). . . . Under *Bostock*, we apply a 'simple test' for sex discrimination—'change one thing at a time and see if the outcome changes.' 590 U.S. at 656, 671. 'If changing the employee's sex would have yielded a different choice by the employer,' then the employer has discriminated based on sex. *Id*. at 659–60.

*Lange v. Houston Cnty.*, 152 F.4th 1245, 1251 (11th Cir. 2025) (*en banc*) (alteration adopted); *see also United States v. Skrmetti*, 605 U.S. 495, 521 (2025) (in the context of an equal protection clause challenge, applying the logic of *Bostock*'s but-for test and changing the employee's sex to determine if sex is a but-for cause of the employer's decision). As such, I disagree with Plaintiff's argument that we can simply skip over the "change-one-thing-at-a-time" but-for test. (Doc. 48 at 7–9). The Eleventh Circuit in *Lange* made clear that we cannot.

However, applying the *Bostock* but-for test in this case shows that Plaintiff has plausibly alleged that Defendants' medical plan discriminates on the basis of sex in violation of Title VII. Plaintiff is a woman attracted to women. To qualify for benefits, she must meet the definition of infertility through paid-for cycles of artificial insemination. Now flip one thing—her gender—and we have a man attracted to women. And the plan would treat him differently—it would give him the option of fertility benefits without having to meet any definition of infertility.

(Doc. 46 at ¶ 19). Alternatively, even if we kept the flipped person (the male attracted to women) in the same rubric Plaintiff finds herself—being stuck with having to meet the definition of infertility—he could meet the definition without the costs associated with six cycles of IUI by using the cost-free coitus option (an option not available to the lesbian woman). (Doc. 48 at 9–12). In simplest terms, Plaintiff alleges that the plan offers male employees attracted to women (and their covered female partners) the option to meet the definition of "infertile" cost-free, while female employees attracted to women, by definition, will have to pay for some level of treatment before they could possibly meet the definition of infertility under the plan. (Doc. 46 at ¶¶ 21, 25–30). Women attracted to women, she alleges, are treated differently than men attracted to women. And because she meets the but-for test set forth in *Bostock* (because changing Plaintiff's sex to male would result in a different choice by the employer—a male employee and his covered female partner would have the cost-free option of meeting the plan's infertility definition), Plaintiff states a claim. *See Bostock*, 590 U.S. at 659–60.

Defendants argue that if Plaintiff were a male, she would not be eligible for benefits because the benefits at issue are available to treat *female* infertility. (Doc. 47 at 3–5 and Doc. 49 at 3–4 & n.4). This misses the point.

If Plaintiff were a man attracted to women, Plaintiff's covered heterosexual female partner would have the option (that Plaintiff, as a lesbian woman, does not) of meeting the definition of infertility without the costs associated with six cycles of IUI. Defendants say that after you flip the gender to a man, the man would not have any anatomical ability to take advantage of the infertility benefits that Plaintiff claims she had to pay for. (Doc. 47 at 3–4). Therefore, Defendants argue, the outcome is the same—no entitlement to benefits. As noted above, I'm not entirely convinced that things like IVF are only for female infertility. *See supra* n.2. But regardless, even assuming those benefits have no applicability to the man that results from the gender flip, when the Eleventh Circuit encountered a similar problem after performing a "change-one-thing" gender flip in *Lange*, it looked to the anatomically-correct, opposite-gender dependent of the flipped person. In *Lange*, the Eleventh Circuit explained:

> The County's policy does not pay for a sex change operation for anyone regardless of their biological sex. . . . Lange is a natal man. If Lange were instead a natal woman who wanted a female-to-male sex change, the insurance policy would not pay for it. **Or if Lange were a natal woman who sought coverage for the same male-to-female sex change that Lange received (perhaps for a male dependent), the County's policy would operate in the same way—it would deny coverage.** Nothing about the policy exclusion turns on whether the County's employee is a man or woman.

152 F.4th at 1252 (emphasis added). Using the same logic as applied by the Eleventh Circuit in *Lange*, if Plaintiff were a male who sought coverage for the same female infertility benefits that Plaintiff sought ("perhaps for a female dependent," *id.*), Plaintiff would have had the option to meet the definition of infertility without paying first for six cycles of IUI (by having unprotected heterosexual intercourse).

Defendants look to *Lange* for support of their position, (Doc. 47 at 3–5), but the case does not help them. In *Lange*, regardless of whether the employee (or the employee's covered dependent) was born male or female, sex change operations were not covered under the medical plan (although the specific procedures would be covered if "required because of medical conditions, such as cancer or injuries from a car accident, for an employee of either sex"). 152 F.4th at 1252 ("Nothing about the policy exclusion turns on whether the County's employee is a man or woman."). Here, however, the opposite is true. Keeping all things about Plaintiff the same except for her gender—in other words, if Plaintiff were a man who was attracted to women rather than a woman attracted to women—the hypothetical male Plaintiff (and his covered female dependent) would have the cost-free coitus option to qualify for infertility coverage under Defendants' plan. The court in

*Lange* even noted that the plan at issue in that case "does not say, for example, that transgender employees must pay more than nontransgender employees or that transgender employees or their dependents receive reduced benefits." 152 F.4th at 1253. Plaintiff argues, and the Court agrees, that the plan provision at issue here is more akin to the exception noted in *Lange* (here, lesbian employees must pay more than non-lesbian employees in order to access infertility benefits). (*See* Doc. 48 at 11–12).

Plaintiff points to *Berton v. Aetna Inc.*, No. 23-cv-01849-HSG, 2024 WL 869651 (N.D. Cal. Feb. 29, 2024), in support of her argument that the medical plan's definition is facially discriminatory. (Doc. 48 at 12–14). In *Berton*, a judge in the Northern District of California considered whether a nearly identical insurance provision was discriminatory under the Affordable Care Act (ACA). 2024 WL 869651, at *1–2. As in this case, the plaintiff in *Berton* is a lesbian who was denied coverage for fertility benefits until she was determined to be infertile (and to establish infertility, the medical plan required the plaintiff to show that she was unable to conceive after 6–12 months of frequent, unprotected coitus or 6–12 cycles of donor insemination, depending on her age). *Id.* at *1. The plaintiff argued that her employer's medical plan provided inequal access to fertility benefits by

placing additional burdens on couples in same-sex partnerships, as heterosexual couples had the option to establish infertility in two ways while same-sex couples were given only one way to establish infertility. *Id*. at *1–2. The court in *Berton* found that the plaintiff had plausibly alleged that the medical plan policy, on its face, "imposes inherently different and more demanding burdens on same-sex partners" because heterosexual partners could "show infertility without incurring any out-of-pocket costs, because they have the option of doing so through 'frequent sexual intercourse'" while "same-sex partners have only one way to demonstrate infertility: they must go through expensive cycles of donor insemination." *Id*. at *4. Plaintiff also cites to another similar case under the ACA, *Murphy v. Health Care Serv. Corp.*, No. 22-cv-2656, 2023 WL 6847105 (N.D. Ill. Oct. 17, 2023), in which the court found that the plaintiff adequately alleged discrimination based on sexual orientation where lesbian women could not meet a medical plan's definition of infertility without incurring out-of-pocket costs, while heterosexual individuals could do so. (Doc. 48 at 13–14). The Court finds *Berton* and *Murphy* persuasive. As in *Berton* and *Murphy*, Plaintiff in this case has plausibly alleged that lesbian employees have different available pathways of access to the plan's infertility benefits than heterosexual employees, (Doc. 48 at 12–

14), and that the plan is therefore "facially discriminatory because it imposes an unequal burden on same-sex couples as compared to opposite-sex couples," *Berton*, 2024 WL 869651, at *4.

Defendants contend that Plaintiff's sex-discrimination claim necessarily fails because the benefits available under the medical plan do not differ based on an employee's sexual orientation. (Doc. 47 at 5–8). The Court is unpersuaded by this argument. Plaintiff argues that, while the available benefits under Defendants' medical plan are the same for heterosexual and non-heterosexual employees once an employee is found to be infertile, there is discrimination in the cost of access to those benefits. (Doc. 48 at 14). The Eleventh Circuit in *Lange* cites to *City of Los Angeles, Dep't of Water and Power v. Manhart*, 435 U.S. 702 (1978), which the Court finds persuasive. 152 F.4th at 1253. In *Manhart*, the Supreme Court considered whether an employer's practice requiring female employees to make larger contributions to its pension fund than male employees was discriminatory under Title VII. 435 U.S. at 704. The "monthly [retirement] benefits for men and women of the same age, seniority, and salary [under the employer's pension plan were] equal," but female employees were required "to make monthly contributions to the fund which were 14.84% higher than the contributions required of comparable

male employees" to account for the fact that women, on average, live longer than men. *Id*. at 705. The Supreme Court found that these differing monthly contributions based on sex were discriminatory (even though similarly situated male and female employees received equal pension benefits upon retirement). *Id*. at 711. As in *Manhart*, even though the fertility benefits offered under Defendants' plan are the same for both heterosexual and non-heterosexual employees, Plaintiff has plausibly alleged that there is a disparity in the costs required to access those fertility benefits for non-heterosexual employees.

Defendants argue that some individual heterosexual women (like all homosexual women) are unable to take advantage of the unsuccessful-coitus route towards the definition of "infertile." (Doc. 47 at 6–8). Defendants point out, for example, that a heterosexual woman might not have a partner, her partner might be serving overseas, she might have a medical condition that prohibits procreative sex, or she might have to spend money (paying someone to watch the children, or for a hotel room) to make the coitus method work. *Id.* But, again, that misses the point. That there may be some heterosexual women who cannot take advantage of the cost-free route for qualifying as infertile matters not—those women are not being discriminated against based on a protected characteristic. The heterosexual

woman, to use Defendants' examples, who has to pay for a hotel room to distance her and her partner from the children, or whose partner is serving overseas, may not be able to utilize the cost-free option at that moment, but that prohibition is not because of her heterosexuality. And it is not immutable. When her partner returns, or the kids go elsewhere, the option is there. For Plaintiff, on the other hand, the cost-free method (available as a whole to the heterosexual group) is a non-starter—it is simply not an option because of her homosexuality.

Accordingly, I **RECOMMEND** that Defendants' motion to dismiss be **DENIED** as to Plaintiff's sex discrimination claims based on disparate treatment (Count I).

**2. Disparate Impact**

Plaintiff brings an "alternative" claim of disparate-impact sex discrimination "to the extent Defendants deny the existence of a facially discriminatory policy on the basis of sexual orientation." (Doc. 46 at ¶ 58; *see id*. at ¶¶ 54–63). Defendants argue that Plaintiff fails to state a claim on her disparate-impact theory because she conflates her disparate-impact and disparate-treatment claims, fails to plead a particular employment practice, and fails to plead any statistical disparity. (Doc. 47 at 8–17). As an initial matter, under Federal Rule of

Civil Procedure 8, Plaintiff may plead alternative statements of a claim. Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."). And "[i]f a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." *Id*. Here, Plaintiff has clearly pled Count II as an alternative claim "to the extent Defendants deny" that the medical plan's policy to access fertility benefits is facially discriminatory. (Doc. 46 at ¶ 58). She alleges that "Defendants' policy, even if facially neutral as to their sexual orientation, has . . . an illegal and discriminatorily disparate impact on Plaintiff and the numerous members of the putative Class, all of whom are lesbians, without any business necessity." *Id.*; *see also Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1213 n.16 (11th Cir. 2018) ("Rule 8(d)(2) requires that alternative statements be set out in the pleading, a requirement that is generally met through either-or propositions or if-then allegations." (internal quotation marks omitted)). Because the Court finds that Plaintiff's disparate-treatment claim is sufficiently pled, her disparate impact alternative claim is also sufficiently pled under Rule 8(d)(2). *See Diaz/Fritz Grp., Inc. v. Zurich American Ins. Co.*, No. 8:12-cv-716-T-26EAJ, 2012 WL 12909907, at *1 (M.D. Fla. Apr. 12, 2012) (finding that the plaintiff was

authorized under Rule 8 to bring alternative claims and because "the pleading [of alternative claims] is sufficient if any of them is sufficient," "any one of [the complaint's] alleged breaches of contract . . . is more than sufficient to state a plausible claim for relief for an action sounding in breach of contract"). Accordingly, I **RECOMMEND** that Defendants' motion to dismiss be **DENIED** as to Plaintiff's sex-discrimination claims based on disparate impact (Count II).

Further, even if the Court were to consider the specific allegations of Plaintiff's disparate-impact claim, she has plausibly alleged sufficient facts to state a claim at this stage of the proceedings. As with her disparate-treatment claim, while Plaintiff need not establish a prima facie case to survive Defendants' motion to dismiss, *see Swierkiewicz*, 534 U.S. at 510–11, it is useful for guidance purposes to note that a plaintiff can establish a prima facie case of disparate-impact sex discrimination by showing an "employment practice[ ] that [is] facially neutral in [its] treatment of different groups but that in fact fall[s] more harshly on one group than another and cannot be justified by business necessity." *Camara v. Epps Air Serv., Inc.*, 292 F. Supp. 3d 1314, 1337 (N.D. Ga. 2017) (internal quotation marks omitted), *abrogated on other grounds by Groff v. DeJoy*, 600 U.S. 447 (2023).

Defendants argue that Plaintiff has not identified a particular employment practice and has not pled any statistical disparity. (Doc. 47 at 11–17). The Court disagrees. Plaintiff has clearly pled a particular employment practice—the medical plan's definition of infertility "that makes it impossible for lesbians to qualify for coverage of fertility treatment benefits . . . without first paying out-of-pocket for a requisite number of artificial insemination cycles." (Doc. 46 at ¶ 59).

Further, Plaintiff has sufficiently pled, at this early stage, that Defendants' allegedly facially neutral policy (the medical plan's definition of infertility) had an adverse, disproportionate impact on non-heterosexual employees because the policy "makes it **impossible** for lesbians to qualify for coverage of fertility treatment benefits . . . without first paying out-of-pocket for a requisite number of artificial insemination cycles." *Id*. (emphasis added). As she notes in her response brief, on the face of Defendants' infertility policy, **all** lesbian employees are required to spend thousands of dollars for at least six cycles of IUI to be eligible for fertility treatments under the medical plan while heterosexual employees not subjected to such a barrier and "are afforded the opportunity to qualify for fertility benefits under the Medical Plan without paying for six or twelve cycles of IUI." (Doc. 48 at 21). "To establish a prima facie disparate impact claim [at the summary-

judgment stage], a plaintiff must show a statistically significant disparity in the treatment of two groups. This is frequently proved through statistics, but not always." *Camara*, 292 F. Supp. 3d at 1338 (internal citations omitted). "Circumstantial evidence, complemented by judicial notice to show that a facially neutral policy must in the ordinary course have a disparate impact on a protected group of which an individual plaintiff is a member is often utilized." *Craig v. Ala. State Univ.*, 804 F.2d 682, 687 n. 7 (11th Cir. 1986) (internal quotation marks omitted); *see also Walden v. Raimondo*, No. 5:21-CV-304 (MTT), 2024 WL 625231, at *5 (M.D. Ga. Feb. 14, 2024) (finding that the plaintiff did not fail to state a claim of disparate impact "because he did not allege the exact statistical disparity" because "that information becomes available during discovery, not prior to [the plaintiff] filing suit" and collecting cases that did not require evidence of disparate impact before discovery). The Court finds that Plaintiff has plausibly alleged sufficient facts, at this stage, to state a disparate-impact claim.

**C. Class Action**

Finally, Defendants argue that Plaintiff has not sufficiently pled her class action allegations under Federal Rule of Civil Procedure 23. (Doc. 47 at 17–23). Federal Rule of Civil Procedure 23 governs class actions. "A class action may be

maintained only when it satisfies all the requirements of [Rule] 23(a) and at least one of the alternative requirements of Rule 23(b)." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1260 (11th Cir. 2003) (internal quotation marks omitted). Under Rule 23(a), the four prerequisites to bringing a class action are:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In this case, the relevant alternative requirements are Rule 23(b)(1) or (2), (*see* Doc. 46 at ¶ 44), under which a court must find that:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests; [or]
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . .

Fed. R. Civ. P. 23(b)(1), (2). Rule 23(c) directs a district court, "[a]t an early practicable time after a person sues or is sued as a class representative, . . . [to] determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A).

The Eleventh Circuit has held that "[w]hile it is sometimes possible to decide the propriety of class certification from the face of the complaint, . . . class certification is an evidentiary issue, and it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Herrera v. JFK Med. Ctr. Ltd. P'ship*, 648 F. App'x 930, 934 (11th Cir. 2016) (internal quotation marks omitted) (holding that the district court erred in finding, as a matter of law, that class treatment was inappropriate based on the face of the plaintiffs' complaint). "In fact, the determination usually should be predicated on more information than the complaint itself affords. The court may, and often does, permit discovery relating to the issues involved in maintainability, and a preliminary evidentiary hearing may be appropriate or essential. After all, class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id*. (internal quotation marks, citations, and footnote omitted).

Here, the Court finds that "this [is] not the sort of case where it is obvious from the pleadings that the individual issues would overwhelm the common issues." *Id.* Rather, the parties here disagree over the suitability of this case for class determination, and it would be premature to deny certification without the benefit of any discovery. *See id.* at 935, n.3. This should not be read to suggest any opinion that Plaintiff's class claims will ultimately warrant certification of the class, although preliminarily I have real concerns about that. Rather, the issue is too complex to determine solely on the face of the complaint without allowing discovery. Accordingly, I **RECOMMEND** that Defendants' motion to dismiss be **DENIED** as to Plaintiff's class allegations.

## IV. CONCLUSION

For the reasons stated above, **IT IS RECOMMENDED** that Defendants' motion to dismiss the second amended complaint, (Doc. 47), be **DENIED.**

**IT IS SO RECOMMENED,** this 15th day of July, 2026.

CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE