**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| TARA M. KULWICKI,<br><br>Plaintiffs,<br><br>v.<br><br>COBB HOSPITAL, INC. and WELLSTAR HEALTH SYSTEM, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action File No.<br>1:24-cv-04658-MLB-CCB<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

**DEFENDANTS' OBJECTIONS**
**TO NON-FINAL REPORT AND RECOMMENDATION**

As the Court explained at the September 10, 2025 Hearing, "what fidelity to *Bostock* means is that you flip the sex and keep all other characteristics of the person the same." (Doc. 45, p. 21.) If Plaintiff were a male seeking to obtain the same benefits to treat female infertility she sought as a female, she would not be in a better position because as a male she would have no pathway to obtain those same benefits. Thus, as the Court succinctly and correctly noted at the Hearing, "[s]he doesn't have it when she's a homosexual woman and she doesn't have it when she's a heterosexual male . . . . Therefore, the basis is not her sex." (Doc. 45, p. 45.) Because changing the sex of the individual (the **one thing** *Bostock* directs a Court to change) does not produce a different outcome, Plaintiff fails to state a violation of Title VII.

Instead of staying faithful to this simple test, the R&R contaminates the analysis by changing the nature of Plaintiff's claim and modifying characteristics of the person other than sex. As happens when a test is tainted with improper inputs, the R&R reaches an erroneous result. Therefore, the Court should reject the R&R's recommendation and, because proper application of the *Bostock* test establishes that Plaintiff fails to state a violation of Title VII under either a disparate treatment or disparate impact theory, the Court should grant Defendants' Motion and dismiss Plaintiff's Second Amended Complaint ("SAC") with prejudice.[1]

## ARGUMENT

### I. The R&R Misconstrues Plaintiff's Allegations.

The R&R initially errs by misconstruing Plaintiff's allegations. Because these errors appear to contribute to the R&R's failure to stay faithful to the *Bostock* test, Defendants will first address those flaws with the R&R.

To this point, the R&R contends that, "[a]t the most basic level, [] the plan treats men and women differently when it comes to fertility benefits" (Doc. 50, p. 11) and seems puzzled that the parties "spend most of their time in the briefing . . . focus[ing] on sexual orientation." (*Id.* at 12). Of course, the reason the parties focus their briefing on sexual orientation is that the SAC alleges that Defendants

[1] Even if the Court found Plaintiff could state a claim under a disparate treatment or disparate impact theory the Court should reject the R&R's finding that Plaintiff adequately pled class allegations for the reasons set forth herein.

discriminated against Plaintiff because of her sexual orientation. *See, e.g.*, Doc. 46, ¶ 48 ("Defendants intentionally denied Plaintiff and Class Members a term or condition of their employment because of their sexual orientation in violation of Title VII[.]") While the R&R did not recommend the Court deny Defendants' Motion based solely on this erroneous articulation of the nature of Plaintiff's claim, the R&R dedicates a lengthy footnote to suggesting Defendants failed to meaningfully address this issue even though the issue identified by the R&R differs from the claim actually pled by Plaintiff in the SAC. (Doc. 50, p. 12, fn. 2.)

Beyond criticizing Defendants for not addressing a claim not actually pled by Plaintiff, footnote 2 also reflects other flaws in the R&R's analysis:

*First*, the footnote improperly credits the allegation in Paragraph 35 of the SAC contending that Plaintiff was "forced to personally incur the costs of fertility treatment, including IUI and IVF to further her efforts to conceive." Even under Plaintiff's theory, she could have established eligibility for the same benefits to treat female infertility within the same timeframe as a heterosexual woman. Rather, Plaintiff's contention is necessarily limited to a claim that she was forced to incur an additional cost to establish eligibility for those benefits.[2] Put differently, Plaintiff's

[2] The R&R recognized this point later in the document – "Plaintiff argues that, while the available benefits under Defendants' medical plan are the same for heterosexual and non-heterosexual employees once an employee is found to be infertile, there is discrimination in the cost of access to those benefits." (Doc. 50, p. 20.)

claim is for the cost of artificial insemination required to establish she was infertile, not for the benefits to treat infertility. By focusing on the nature of the benefits available to treatment infertility, the R&R errs given that Plaintiff has not and cannot identify a difference in the benefits available based on a female's sexual orientation.[3]

*Second*, footnote 2 improperly analyzes benefits available to treat male infertility.[4] Again, Plaintiff is not challenging the treatment available, but rather the diagnostic process for a female to establish she is infertile. In any event, the R&R's statement that it "is not necessarily a given" that a man would not seek the benefits identified by Plaintiff is itself erroneous. In making this statement, the R&R cites articles from WebMD.com and the Yale Medicine Male Infertility Program. (Doc. 50, p. 12, fn. 2.) Putting aside the propriety of the Court citing information outside the four corners of the operative pleading, this argument improperly conflates the individual with the underlying medical condition with the individual who receives treatment. Specifically, the articles discuss that male infertility may be a contributing

---

[3] Otherwise, as the parties discussed at the hearing, Plaintiff would be seeking ***preferred*** status due to her sexual orientation by circumventing the timeframes set forth in the Plan that apply regardless of whether the individual establishes infertility through male/female coitus or artificial insemination.

[4] As the Supreme Court recognized in *Skrmetti*, "a key aspect of any medical treatment" is "the underlying medical concern the treatment is intended to address." 145 S.Ct. at 1833. Here, the underlying medical concern is female infertility, not male infertility.

factor to a female's inability to conceive and explain that in such a situation the female might utilize IUI or IVF. In other words, if the man is the reason for or contributes to the inability of the female to conceive (e.g., low sperm count or poor sperm motility), the remedy is not for him to go through IUI or IVF – it's for his female partner to use one of those procedures to enable her to conceive despite the challenges presented by the man's sperm. As such, it is error for the R&R to assume a male might seek the treatment to address female infertility at issue in this lawsuit.

## II. The R&R Properly Found The *Bostock* Test Must Be Applied, But Misapplied It.

The R&R correctly found that *Lange* "made clear" that a Court cannot simply skip over the but-for test set forth in *Bostock.* (Doc. 50, p. 15.) In *Lange*, the Eleventh Circuit explained, "[t]he Supreme Court has held that Title VII prohibits employers 'from firing employees on the basis of homosexuality or transgender status' *when* 'discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex.'" 2025 WL 2602633 at *3 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 669 (2020)) (emphasis added).

While the R&R correctly recognized the obligation to utilize the *Bostock* test, it erred in its application of the test. As the Court explained at the September 10, 2025 Hearing, "what fidelity to *Bostock* means is that you flip the sex and keep all other characteristics of the person the same." (Doc. 45, p. 21.) The R&R does not stay faithful to *Bostock* in that it changes factors other than the sex of the individual.

Specifically, the R&R's analysis improperly changes not only the sex of the individual, but also the benefits being sought. The R&R articulated the test in this way: "Now flip one thing – her gender – and we have a man attracted to women. And the plan would treat him differently – it would give him the option of fertility benefits without having to meet any definition of infertility." (Doc. 50, p. 14.) Contrary to the R&R's conclusion, as a male, Kulwicki would **not** be eligible for the benefits sought by Plaintiff because by their explicit terms they are only available to females. Plaintiff alleges she "sought certification from the Medical Plan for [Comprehensive Infertility Services] benefits (which include IUI treatments) so that she could conceive. On July 21, 2021, Defendants' health plan denied Kulwicki access to fertility benefits because she did not meet the plan's definition of infertility." (SAC, ¶ 22.) However, the Plan states, "[t]o be an eligible covered *female* for benefits you must be covered under this SPD as a team member or be a covered dependent." (Doc. 46-2, p. 70.) As such, it is erroneous to conclude that as a male Kulwicki would be eligible for the benefits she sought without needing to meet any definition of infertility. Accordingly, and as the Court noted at the Hearing, "[s]he doesn't have it when she's a homosexual woman and she doesn't have it when she's a heterosexual male . . . . Therefore, the basis is not her sex." (Doc. 45, p. 45.)

The R&R further contends that Defendants "miss[] the point" by arguing that, "[i]f Plaintiff were a male, she would not be eligible for benefits because the benefits

at issue are available to treat female infertility." (Doc. 50, p. 15.) Respectfully, Defendants' argument stays faithful to *Bostock* by changing only the sex of the individual involved, while the R&R strays from *Bostock* by changing Plaintiff's sex and the benefits sought. And another error is reflected in the R&R's conclusion that, "[i]f Plaintiff were a man attracted to a woman, Plaintiff's covered heterosexual female partner would have the option (that Plaintiff, as a lesbian woman,) does not of meeting the definition of infertility without the costs associated with six cycles of IUI." (Doc. 50, p. 16.) This analysis also changes the individual seeking the medical treatment by flipping Kulwicki's sex to male and then considering the situation from the perspective of male Kulwicki's hypothetical heterosexual female partner. With these extra steps, the R&R effectively "unwinds" the *Bostock* test by flipping the comparator's sex back to female. 154 F.4th at 1252.

The R&R engages in similar errors by concluding that *Lange* "does not help" Defendants. To the contrary, *Lange* emphasizes the directive to only change "one thing" by asking: "assume Lange were a natal woman instead of a natal man: would the insurance policy have covered any of those procedures as part of a sex change? Again, the answer is no. Some of those procedures would be impossible for a person with female anatomy to undergo . . . . And others would be denied to both natal men and women as part of a sex change." *Id.*

Here, if Kulwicki were a natal man instead of a natal woman, would the Plan provide the benefits she sought to treat female infertility without the need to meet the same definition of infertile? Of course, the answer is no given that the Plan language does not make these treatments available to males and given that the procedures at issue would be impossible for a person with male anatomy to undergo.

The R&R cites language in *Lange* stating that, "if Lange were a natal woman who sought coverage for the same male-to-female sex change that Lange received (perhaps for a male dependent), the County's policy would operate the same way – it would deny coverage." 152 F.4th at 1252. Seizing on this language, the R&R contends that "if Plaintiff were a male who sought coverage for the same female infertility benefits that Plaintiff sought (perhaps for a female dependent), Plaintiff would have had the option to meet the definition of infertility without paying for first for six cycles of IUI (by having unprotected heterosexual intercourse)." However, the reference in *Lange* to a dependent did not change the analytical framework the Courts must employ.[5] At most, it served to further confirm the lack

[5] The R&R also twisted *Lange*'s reference to a "dependent." The Eleventh Circuit posed this hypothetical about a minor child: "if Lange were a natal woman who sought coverage for the same male-to-female sex change that Lange received (perhaps for a male dependent)." *Id.* The R&R modified the hypothetical to be about a spouse, which causes the reasoning to fall apart. Unlike the relationship between a parent and minor child, which permits the parent to make medical decisions, one spouse does not "seek coverage" for the other to undergo a particular medical procedure. Rather, under this hypothetical, each spouse is a participant in the plan

of any sex-based discrimination based on the specific facts in that matter. As explained above, when analyzed under the *Bostock* test as directed by the Supreme Court and Eleventh Circuit, there is no sex-based discrimination because changing the individual's sex does not change eligibility for the benefits at issue.

Along similar lines, the R&R errs by referring to "the exception noted in *Lange*." (Doc. 50, pp. 11-12). *Lange* did not and could not create any exceptions to the Supreme Court precedent established in *Bostock*. Instead of applying the "simple" test set forth in *Bostock*, the R&R improperly seeks an exception to this binding precedent.

Finally, the R&R errs by relying on *Berton v. Aetna, Inc.*, No. 23-cv-1049-HSG, 2024 WL 869651 (N.D. Cal. Feb. 29, 2024) and *Murphy v. Health Care Service Corporation*, No. 22-cv-2656, 2023 WL 6847105 (N.D. Ill. Oct. 17, 2023). Neither case alleged a violation of Title VII and neither case even specifically discusses application of the "flip the sex" test set forth in *Bostock*.

## III. The R&R Errs By Finding That Plaintiff's Disparate Impact Claim And Class Allegations Can Survive Defendants' Motion to Dismiss.

The R&R's analysis of the disparate impact claim and class allegations reflects a consistent pattern: at each juncture where Plaintiff's pleading is deficient,

---

and responsible for seeking coverage for his or her own medical care. In any event, this hypothetical does not change the need to apply the *Bostock* test.

the R&R defers the question to a later stage rather than applying the plausibility standard that *Twombly* and *Iqbal* require when deciding a motion to dismiss. While the R&R correctly recites the plausibility standard, it does not faithfully apply it. The R&R acknowledges that Plaintiff has not alleged statistical disparity but excuses this because “that information becomes available during discovery.” It acknowledges that class certification is “an evidentiary issue” but declines to evaluate whether the class allegations are plausible on their face, despite expressing “real concerns.” This approach effectively converts the 12(b)(6) standard into the notice-pleading standard that the Supreme Court rejected in *Twombly*. Defendants respectfully submit that *de novo* review of these issues will reveal that Plaintiff has not crossed the line from “conceivable” to “plausible,” and the motion to dismiss should be granted. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## A. The R&R Committed Error in Finding that the SAC Plausibly Alleged Sufficient Facts to State a Claim of Disparate Impact.

### 1. The R&R Mischaracterizes Defendants’ Argument and Improperly Bootstraps the Disparate Impact Claim.

First, the R&R suggests Defendants challenged Plaintiff’s right to argue disparate impact in the alternative. (Doc. 50, p. 22-23.) Defendants did not contend that alternative pleading is impermissible; rather, Defendants argued that Plaintiff’s disparate impact claim must be independently evaluated under *Twombly* and *Iqbal*.

The R&R's central error is conflating the *right* to plead in the alternative with the *sufficiency* of each alternative theory. Rule 8(d)(2) permits alternative pleading but does not exempt alternative claims from independent scrutiny under Rule 12(b)(6). Each alternative claim must independently satisfy *Twombly* and *Iqbal*. A disparate-impact claim requires (1) identification of a specific, facially neutral employment practice; (2) plausible allegations that the practice causes a statistically significant disparity falling on a protected group; and (3) a causal nexus between the identified practice and the alleged disparity. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i); *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989). These elements are doctrinally and evidentiarily distinct from a disparate-treatment claim, and Plaintiff failed to plead facts that would support each element.[6]

The R&R includes an acknowledgement of this standard, stating that each claim must be pled with enough factual specificity to be "plausible on its face." *See* Doc. 50, p. 8 (citing *Iqbal*). Yet the R&R then abandons this standard when it concludes that "[b]ecause the Court finds that Plaintiff's disparate-treatment claim is sufficiently pled, her disparate impact alternative claim is also sufficiently pled under Rule 8(d)(2)."(Doc. 50, p. 23.) Under this flawed reasoning, any claim — no

[6] The R&R's reliance on *Diaz/Fritz Group, Inc. v. Zurich American Insurance Co.*, (Doc. 50, p. 23) a breach-of-contract case involving alternative theories sharing the same elements, is inapposite because disparate treatment and disparate impact claims require fundamentally different proof.

matter how deficiently pled — survives a motion to dismiss so long as it is labeled "alternative" and appears alongside a viable claim. The R&R's reasoning would effectively immunize any alternatively pled claim from independent scrutiny, and that is not the law.

### 2. Plaintiff Fails to Plead Any Discriminatory Employment Practice.

Despite having filed three versions of her complaint, Plaintiff has failed to identify a specific facially neutral employment practice. Plaintiff's sole candidate for a "specific employment practice" is the Plan's use of a "medical definition of infertility." (SAC, ¶ 59.) But this allegation fails for two independent reasons. First, a medical definition of infertility adopted from established clinical standards is not an "employment practice" – it is a benefit-plan eligibility criterion that applies uniformly to all Plan participants regardless of sex or sexual orientation. *See Wards Cove*, 490 U.S. at 656-57 (superseded on other grounds) (requiring identification of a specific employment practice, not a "bottom line" workforce disparity).

Second, even if the definition could be characterized as an "employment practice," Plaintiff's own allegations demonstrate that it is not facially neutral. Plaintiff alleges the policy "makes it **impossible** for lesbians to qualify for coverage . . . without first paying out-of-pocket." (Doc. 46, p. 17 (emphasis in original).) A policy that makes it "impossible" for a protected group to access benefits on equal terms is not facially neutral – it is facially discriminatory, and the proper vehicle is

disparate treatment, not disparate impact. *See Camara v. Epps Air Serv., Inc.*, 292 F. Supp. 3d 1314, 1337 (N.D. Ga. 2017) ("the factual allegations required to plead disparate treatment discrimination differ from those required for disparate impact discrimination"). Plaintiff cannot have it both ways: either the definition is facially discriminatory (supporting only disparate treatment) or it is facially neutral (potentially supporting disparate impact).[7] Plaintiff's SAC alleges the former while claiming the latter. The R&R's failure to address this internal inconsistency is reversible error.

Plaintiff's failure to identify a specific, facially neutral employment practice is not a mere technicality – it is the absence of the foundational element of any disparate impact claim. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 241 (2005) (requiring plaintiff to "isolat[e] and identif[y] the specific employment practices that are allegedly responsible for any observed statistical disparities"); *Goolsby v. City of*

---

[7] The R&R suffers from a similar defect. The R&R finds that Plaintiff "clearly pled a particular employment practice – the medical plan's definition of infertility." But the R&R simultaneously holds that the plan's infertility definition "it seems, is facial discrimination based on gender, and the analysis could probably end here" – while also sustaining a disparate impact claim premised on the same provision being *facially neutral*. A disparate-impact claim, by definition, challenges a *facially neutral* practice that produces discriminatory effects. *See Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). A disparate-treatment claim challenges a practice that is *facially discriminatory* or motivated by discriminatory intent. *Id.* A single policy provision cannot simultaneously be facially discriminatory (supporting disparate treatment) and facially neutral (supporting disparate impact). These are mutually exclusive characterizations of the same plan provision.

*Monroe*, No. 3:22-CV-82 (CAR), 2023 WL 5672509, at *5 (M.D. Ga. Sept. 1, 2023), *reconsideration denied*, No. 3:22-CV-82-CAR, 2023 WL 6519268 (M.D. Ga. Oct. 5, 2023) (citing *City of Jackson*, 544 U.S. at 241). Indeed, it is Plaintiff's burden to identify the specific employment practice causing the alleged disparate impact, and an allegation of "bottom line" workforce disparity is not enough. *Wards Cove*, 490 U.S. at 656-57 (superseded on other grounds). Because of this failure, Plaintiff's disparate impact claim must be dismissed.[8]

### 3. Plaintiff Fails to Plead Any Statistical Disparity.

As detailed in Defendants' Motion (Doc. 47, p. 11, 13-17) and Reply (Doc. 49, p. 7-9), Plaintiff also has not alleged the existence of any statistical disparity in the application of the Plan's definition of infertility, the availability of fertility benefits, the granting or denial of appeals, or anything else between heterosexual and lesbian women. Plaintiff offers nothing besides labels and conclusions to support

[8] *See McCrae v. Emory Univ.*, No. 1:22-CV-3401-TWT-JSA, 2023 WL 6217372, at *12 (N.D. Ga. May 24, 2023), report and recommendation adopted, No. 1:22-CV-3401-TWT-JSA, 2023 WL 6217376 (N.D. Ga. July 12, 2023) (granting motion to dismiss; "Defendant accurately points out that Plaintiff does not identify any specific policy or practice or explain how it caused a disparate impact"); *Woods v. Lockheed Martin Corp.*, No. 1:18-CV-3501-LMM-CCB, 2019 WL 13078831, at *2 (N.D. Ga. Sept. 4, 2019), *aff'd*, No. 21-13882, 2022 WL 2972852 (11th Cir. July 27, 2022) (granting motion to dismiss and overruling plaintiff's objections to magistrate's recommendation; "Plaintiff does not allege sufficient facts to demonstrate disparate impact and a specific employment practice causing the discrepancy").

her specious claim that the Plan has a disproportionate impact on lesbian women.[9] The R&R's acceptance of Plaintiff's allegation that "all lesbian employees are required to spend thousands of dollars" (Doc. 50, p. 25) as sufficient statistical evidence reflects a fundamental misunderstanding of what disparate impact requires.

Plaintiff's assertion that "zero lesbians" can access benefits without out-of-pocket costs is speculative and theoretical, not statistical. The SAC contains no data on the number of heterosexual vs. lesbian plan members, no data on claims submitted or denied by sexual orientation, and no causal link between sexual orientation and any statistical imbalance.

Further, the allegation that "all lesbian employees" are affected is a logical tautology that no court has accepted as a substitute for statistical evidence. Plaintiff defines the affected group (lesbian employees) by the very characteristic (sexual

---

[9] *Johnson v. SNI Companies*, No. 1:18-CV-03618-AT-JCF, 2019 WL 13269796, at *5 (N.D. Ga. Mar. 18, 2019), *report and recommendation adopted*, No. 1:18-CV-3618-AT, 2019 WL 13269754 (N.D. Ga. Apr. 10, 2019) (granting motion to dismiss where "Plaintiff has not alleged facts or statistics that plausibly show that Defendant's facially neutral alleged practice of adversely viewing online educational backgrounds and unemployment status has a disproportionate impact on African American applicants"); *Barnett v. Cobb Cnty. Sch. Dist.*, No. 1:15-CV-3561-RWS-LTW, 2017 WL 5203049, at *4 (N.D. Ga. Feb. 7, 2017), report and recommendation adopted, No. 1:15-CV-3561-RWS, 2017 WL 5479716 (N.D. Ga. Mar. 15, 2017) (holding that "[c]onclusory assertions regarding statistical disparities are not sufficient to state a disparate impact claim," and granting motion to dismiss where "Plaintiff generally alleges African Americans are arrested more often than other non-minority groups, [but] does not allege statistics or any other facts tending to show that the application of Defendant's arrest policies has had a disproportionate impact").

orientation) that allegedly causes the impact, then asserts that 100% of that self-defined group is affected. This is not statistical evidence, but a definitional circle that is true but statistically meaningless – the equivalent of saying "all left-handed people are affected by a policy that disadvantages left-handed people." It tells the Court nothing about the comparative impact of the Plan's definition on lesbian versus non-lesbian participants, which is the entire point of a disparate impact analysis.

Disparate impact analysis requires a comparison between the rate at which a challenged practice affects members of a protected group versus the rate at which it affects members outside that group. *See Wards Cove*, 490 U.S. at 650–51; *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994–95 (1988); *Barnett*, 2017 WL 5203049, at *4. Plaintiff has not alleged (a) the total number of plan participants, (b)the number of heterosexual women who submitted fertility claims, (c) the number of lesbian women who submitted or were deterred from submitting fertility claims, (d) the approval or denial rates for either group, or (e) any statistical methodology connecting the plan's infertility definition to a measurable disparity. The assertion that "zero lesbians" can access benefits without out-of-pocket costs is theoretical, not statistical, and does not allege that any heterosexual woman actually received the benefits at issue without cost – a necessary baseline for any disparity calculation.

The R&R acknowledges that "[t]o establish a prima facie disparate impact claim [at the summary-judgment stage], a plaintiff must show a statistically

significant disparity in the treatment of two groups." Yet the R&R excuses the total absence of any such allegation by reasoning "that information becomes available during discovery." This rationale would effectively eliminate the statistical-disparity element from the pleading stage entirely, contravening *Twombly*'s instruction that a complaint provide "enough factual matter (taken as true) to suggest" the claim. While Plaintiff need not produce the precise statistical evidence required at summary judgment, she must at least allege *some* factual basis from which a statistical disparity can be plausibly inferred.[10] The complaint contains zero allegations of statistical disparity – not approximate figures, not estimates, not even a general assertion that a disproportionate number of a protected group was affected.

**4. The Required Statistical Data Is Inherently Unobtainable.**

The deficiencies in Plaintiff's complaint described above cannot be cured because the data necessary to support Plaintiff's disparate impact theory is inherently unknowable and undiscoverable. Defendants and other employers do not (and under

---

[10] The R&R's reliance on *Craig v. Alabama State University*, 804 F.2d 682, 687 n.7 (11th Cir. 1986), for the proposition that "[c]ircumstantial evidence, complemented by judicial notice" can substitute for statistics, is misplaced. *Craig* addressed the evidentiary standard at trial, not the pleading standard. At the pleading stage, Plaintiff must still allege facts, even if circumstantial, that make a statistical disparity plausible, and she has not done so. Plaintiff asks the Court to take judicial notice that all lesbians are categorically unable to use the coitus pathway. Judicial notice of a demographic truism does not establish the "statistically significant disparity" required for disparate impact liability, particularly where the plan offers an alternative (artificial insemination) pathway available to all.

most state and federal privacy frameworks, *may not*) track employees' sexual orientation, and no proxy data source exists from which sexual orientation could be reliably inferred. This is not a discovery problem that further proceedings can cure. Plaintiff has identified no mechanism by which she could obtain the data necessary to establish the "statistically significant disparity" required under *Wards Cove* and § 2000e-2(k). Allowing the claim to proceed to discovery would impose substantial costs on Defendants, including potentially intrusive inquiries into employees' sexual orientation, in pursuit of evidence that, by Plaintiff's own theory, does not and cannot exist in any employer's records. The Court should not permit a claim to proceed to discovery when the very data needed to prove it cannot exist.

**5. Sexual Orientation Is Not a Cognizable Category for Disparate Impact Analysis Under Title VII.**

Plaintiff's disparate impact claim compares "lesbian women" to "men and heterosexual women." But Title VII's disparate impact framework prohibits employment practices that cause a disparate impact on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k). *Bostock* held that discrimination "because of" homosexuality is a *form* of sex discrimination for purposes of *disparate treatment* – because it is "impossible to discriminate against a person for being homosexual … without discriminating against that individual based on sex." 590 U.S. at 660. But *Bostock*'s but-for reasoning was expressly tied to intentional discrimination. *Id.* at 659–60. The Court did not address, and had no

occasion to address, whether sexual orientation functions as a cognizable subgroup for disparate impact analysis, which requires statistical comparison between groups defined by a protected characteristic.

Permitting Plaintiff to define her comparison groups as "lesbian employees" versus "heterosexual employees" would effectively create sexual orientation as an independent protected class for disparate impact purposes – a result *Bostock* did not mandate and that no circuit court has endorsed. The proper comparison groups for a sex-based disparate impact claim are men and women – and Plaintiff has not alleged, and cannot allege, that the plan's infertility definition produces a statistically significant disparity between male and female plan participants as groups.

**B. The R&R Erred in Deferring Ruling on Class Allegations.**

**1. The R&R Defers Ruling Without Meaningful Analysis And In The Face Of Its Own Expressed Concerns.**

The R&R held that is "premature to deny certification without the benefit of any discovery," despite acknowledging "real concerns" about whether class certification is warranted. (Doc. 50, p. 29. These "real concerns" undermine the conclusion. If the R&R can identify facial deficiencies in the class allegations, then those deficiencies are ripe for resolution now, not after the parties have incurred the substantial costs of class-related discovery.

The R&R acknowledges that dismissal of class allegations at the pleading stage is appropriate where the complaint facially demonstrates that class treatment

is improper.[11] (Doc. 50, p. 28.) Given Rule 23(C)(1)(a)'s directive to resolve questions of class certification "[a]t an early practicable time," the R&R should have recommended that the Rule 23 class allegations be dismissed. *See, e.g., Padron v. Wal-Mart Stores, Inc.*, 783 F.Supp.2d 1042, 1045-1048 (N.D. Ill., May 9, 2011) (dismissing class claims that "consist[ed] of 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements' of the kind held insufficient in *Iqbal*."); *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982) (finding no "basis for further pursuit of a class action" and that needless delay and expense would result if court awaited further discovery). *See also Lawson v. Life of the South Ins. Co.*, 286 F.R.D. 689, 695 (M.D. Ga. 2012) (same).

**2. The Proposed Class Definition Is Facially Deficient.**

"Class representatives bear the burden to establish that their proposed class is 'adequately defined and clearly ascertainable,' and they must satisfy this requirement before the district court can consider whether the class satisfies the enumerated prerequisites of Rule 23(a)…. [W]ithout an adequate definition for a proposed class, a district court will be unable to ascertain who belongs in it." *Stanton v. NCR Pension Plan*, Case No. 1:17-cv-2309-MLB, 2021 WL 1170109, at *4 (N.D.Ga. Mar. 29,

[11] Defendants distinguished Plaintiff's cited cases (*Snover*, *Gill-Samuel*, *Etzel*, *Herrera*), which involve Rule 12(f) motions to strike class allegations, not Rule 12(b)(6) motions to dismiss like Defendants filed. (Doc. 49, p. 10-13.) The standard for striking allegations under Rule 12(f) is different from the standard for dismissal under Rule 12(b)(6). The R&R does not address this procedural distinction.

2021), citing *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021). Plaintiff's proposed class is not reasonably defined, and she provides no detail of how she would ascertain or identify members of her proposed class.

Plaintiff's proposed class is not "adequately defined" because it requires, as a threshold matter, the identification of "lesbian individuals" employed by Defendants (SAC, ¶ 38). This is a characteristic that is inherently self-identified, not recorded in employment records, and not subject to objective verification.

Plaintiff's proposed class also is overbroad. First, it sweeps in individuals who never submitted claims for fertility benefits under the Plan, individuals who may submit claims in the future, and individuals who may never seek fertility treatment at all. A class member who has never sought fertility treatment, never submitted a claim, and may never do so has suffered no injury-in-fact traceable to the plan's infertility definition. Second, it would include all those who "submitted a claim or precertification request for infertility treatment benefits and were denied for failing to satisfy the Medical Plan's definition of "infertility[.]"(SAC, ¶ 38.) This group is so broad as to *include* those who could engage in "six months or more of timed, unprotected coitus," the very group Plaintiff alleges she could not be part of. (SAC, ¶ 21.) Third, it would include those who "paid out-of-pocket for infertility treatment knowing they would be denied benefits for the same reason[.]" (SAC, ¶ 38.) Said differently, Plaintiff would include those who obtained infertility treatment through

a source other than the Medical Plan. Once again, Defendants would have no record of those who did not submit for benefits under the Medical Plan. And there may be valid reasons why one would forgo Medical Plan benefits.

The R&R's acceptance of Plaintiff's proposed class also is inconsistent with other analysis in the R&R. The R&R concluded that the alleged discrimination affects all women (not just lesbians) relative to men. *See* Doc. 50, p. 11. If that is correct, then Plaintiff's proposed class of "lesbian individuals" is both underinclusive (because it excludes heterosexual women who are allegedly also harmed) and improperly defined (because it uses sexual orientation as a class boundary when the R&R's own theory of harm is sex-based, not orientation-based). Conversely, if the harm is specific to lesbian women, then the R&R's sex-discrimination analysis is flawed. The R&R cannot have it both ways, and this contradiction demonstrates that the class allegations should be dismissed.

### 3. Plaintiff Fails to Satisfy Rule 23(a).

Plaintiff's Second Amended Complaint also does not and cannot satisfy Rule 23(a)'s requirements that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

With regard to Rule 23(a)(1), Plaintiff concedes that the size of the class is "unknown" but speculates that because "Defendants have tens of thousands of employees" then "a sufficient number of these individuals will be within the class definition to meet the numerosity requirement." (SAC, ¶ 40.) The allegation is not only conclusory, but also ignores a core requirement of the Rule that "the class is so numerous that joinder of all members is impracticable." Here, Plaintiff wholly failed to allege any facts that would show joinder is impracticable.

With regard to Fed. R. Civ. P. 23(a)(2) and (3), Plaintiff offers only conclusory allegations of commonality and typicality. This is fatal to a class allegation, as Plaintiff cannot link her individual claim of discrimination and "the existence of a class of persons who have suffered the same injury as that individual." *Falcon*, 457 U.S. at 157. The Supreme Court has described two ways a plaintiff can bridge this "conceptual gap" to show commonality among putative class members: (i) claim that the employer used a biased testing procedure; or (ii) offer significant proof that an employer operated under a general policy of discrimination that manifested itself in the same way for all class members. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 353 (2011). The first has no application here (which is not disputed by Plaintiff), and Plaintiff has not pled any facts to suggest Defendants "operated under a general policy of discrimination," much less any policy that "manifested itself in the same way for all class members."

Moreover, Plaintiff's allegations acknowledge that the claims of putative class members are highly individualized and not susceptible of resolution in "one stroke," *Wal-Mart*, 564 U.S. at 350. At the heart of Plaintiff's claims is her assertion that she "cannot meet the plan's definition of infertility by having "timed, unprotected heterosexual coitus" because she is a lesbian woman." (SAC, ¶ 23.) Plaintiff's proposed class is comprised of "lesbian individuals." (SAC, ¶ 38.) However, there is no across-the-board way to determine that all members of this proposed class, like Plaintiff, "cannot engage in coitus."

Likewise, Plaintiff cannot establish that she would be an adequate representative of the proposed class. The bare assertion by Plaintiff (who pleads she is lesbian) that she represents the interests of *all* lesbian women (a vague category that includes any number of perspectives) is facially and fatally flawed. That Plaintiff claims that she has hired competent counsel as the basis to establish adequacy (SAC, ¶ 42) is not enough to properly plead this element of a Rule 23 class action.

**4. Plaintiff Fails to Satisfy Rule 23(b).**

Plaintiff also cannot meet the requirements of Rule 23(b). Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Plaintiff seeks injunctive relief for current and former employees of Defendant

(SAC, ¶¶ 44, 53, 63), but a unanimous Supreme Court held that former employees "have no claim for injunctive or declaratory relief at all." *Wal-Mart*, 564 U.S. at 365.

Rule 23(b)(2) is unavailable for the additional reason that Plaintiff seeks individualized monetary relief. *See Wal-Mart*, 564 U.S. at 360-61 (Rule 23(b)(2) certification is not permitted where "each class member would be entitled to an individualized award of monetary damages."). Here, Plaintiff seeks for each class member to be awarded individualized monetary relief "for the full value of benefits they would have received" under the benefit plan. (SAC, Prayer for Relief (b)).

Rule 23(b)(3) is unavailable because it requires that common issues "predominate over any question affecting only individual members" and that a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." The "predominance" requirement of Rule 23(b)(3) is "far more demanding" than Rule 23(a)'s commonality requirement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). As described in detail above, the allegations in Plaintiff's SAC show that she will be unable to satisfy even the lower standard of commonality under Rule 23(a), much less the more rigorous predominance requirement of Rule 23(b)(3).

Respectfully submitted, this 29th day of July 2026.

**GREGORY, DOYLE, CALHOUN & ROGERS, LLC**
*Attorneys for Defendants*

*/s/ Charles L. Bachman, Jr.*
Charles L. Bachman, Jr.
Georgia Bar No. 030545
49 Atlanta Street
Marietta, GA 30060
Phone: 770-422-1776
cbachman@gdcrlaw.com

**SEYFARTH SHAW, LLP**

Christopher J. DeGroff*
Andrew L. Scroggins*
Suite 800
233 South Wacker Drive
Chicago, IL 60606-6488
(312) 460-5000
cdegroff@seyfarth.com
ascroggins@seyfarth.com

Samantha L. Brooks*
975 F. Street, NW
Washington, DC 20004-1454
(212) 463-2400
sbrooks@seyfarth.com

* Admitted *pro hac vice*

**CERTIFICATE OF COMPLIANCE WITH L.R. 5.1B**

I certify that the foregoing pleading was prepared in Times New Roman, 14-point font, as approved by Local Rule 5.1B

*/s/ Charles L. Bachman, Jr.*
Charles L. Bachman, Jr.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| TARA M. KULWICKI, individually and on behalf of all other persons similarly situated, | ) | |
| Plaintiffs, | ) | Civil Action File No. 1:24-cv-04658-MLB-CCB |
| v. | ) | JURY TRIAL DEMANDED |
| COBB HOSPITAL, INC. a/k/a WELLSTAR COBB HOSPITAL, INC., and WELLSTAR HEALTH SYSTEM, INC., | ) | CLASS ACTION |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2026, I filed the foregoing DEFENDANTS' OBJECTIONS TO NON-FINAL REPORT AND RECOMMENDATION by electronic filing using CM/ECF, which will automatically send e-mail notification of such filing to all counsel of record.

*/s/ Charles L. Bachman, Jr.*
Charles L. Bachman, Jr.