**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| TARA M. KULWICKI, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COBB HOSPITAL, INC., a/k/a WELLSTAR COBB HOSPITAL, INC., and WELLSTAR HEALTH SYSTEM, INC.,<br><br>Defendants. | Civil Action No.<br>1:24-CV-4658-MLB-CCB<br><br>CLASS ACTION |

**PLAINTIFF'S REPLY IN OPPOSITION TO DEFENDANTS' <u>OBJECTIONS NON-FINAL REPORT AND RECOMMENDATION</u>**

# TABLE OF CONTENTS


I. Magistrate Judge Bly Correctly Applied *Bostock*'s But-For Test, and the R&R Should Be Adopted as to Plaintiff's Disparate Treatment Claim. ..........1

A. *Bostock* Holds That Any Discrimination Based on Sexual Orientation Is Discrimination on the Basis of Sex. ......................................................1

B. The R&R Correctly Applied the *Bostock* But-For Test..............................3

C. *Lange* Does Not Help Defendants—It Confirms Plaintiff's Position..........8

II. The R&R Correctly Recommends Sustaining Plaintiff's Disparate Impact Claim. ..........................................................................................11

III. Magistrate Judge Bly Correctly Declined to Dismiss Plaintiff's Class Allegations..........................................................................................17

CONCLUSION ..........................................................................................20

# TABLE OF AUTHORITIES

Cases Page(s)

*Bostock v. Clayton County*,
590 U.S. 644 (2020) .......... Passim

*Brady v. Livingood*,
360 F. Supp. 2d 94 (D.D.C. 2004) .......... 15

*City of Los Angeles, Dep't of Water and Power v. Manhart*,
435 U.S. 702 (1978) .......... 14

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
406 F. Supp. 3d 1258 (M.D. Ala. 2019) .......... 15

*Craig v. Ala. State Univ.*,
804 F.2d 682 (11th Cir. 1986) .......... 15, 16

*Fitzer v. Am. Inst. of Baking*,
No. 2:09-cv-169, 2016 WL 4223612 (S.D. Ga. Aug. 9, 2016) .......... 18

*General Electric Co. v. Gilbert*,
429 U.S. 125 (1976) .......... 7

*Herrera v. JFK Med. Ctr. Ltd. P'ship*,
648 F. App'x 930 (11th Cir. 2016) .......... 17, 18, 20

*Lange v. Houston Cnty.*,
152 F.4th 1245 (11th Cir. 2025) .......... 8, 9, 10

*Mitchell v. Board of Trustees of Pickens Cty.*,
599 F.2d 582 (4th Cir. 1979) .......... 15

*Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*,
462 U.S. 669 (1983) .......... Passim

*Walden v. Raimondo*,
No. 5:21-CV-304 (MTT), 2024 WL 625231 (M.D. Ga. Feb. 14, 2024) .......... 15

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 20

Rules

Fed. R. Civ. P. 8 .......... 12

Fed. R. Civ. P. 23 .......... 19, 20

Plaintiff, Tara M. Kulwicki, by and through undersigned counsel, files this response in opposition to the objections filed by Defendants Cobb Hospital, Inc. and Wellstar Health System, Inc. (Doc. 52) (hereinafter, "Defs.' Objs.") to the Non-Final Report and Recommendation issued on July 15, 2026 by Magistrate Judge Bly (Doc. 50) ("R&R"), which recommended the denial of Defendants' motion to dismiss (Doc. 47) Plaintiff's Second Amended Class Action Complaint (Doc. 46) ("SAC").

As explained below, Magistrate Judge Bly's R&R correctly dispenses with Defendants' Rule 12(b)(6) arguments, and this Court should adopt it in full.

## ARGUMENT

### I. Magistrate Judge Bly Correctly Applied *Bostock*'s But-For Test, and the R&R Should Be Adopted as to Plaintiff's Disparate Treatment Claim.

Defendants' core objection is that the R&R misapplied *Bostock v. Clayton County*, 590 U.S. 644 (2020), by changing something other than Plaintiff's sex when performing the hypothetical gender-flip analysis. (Defs.' Objs. 4–9.) Defendants are wrong. The R&R correctly and faithfully applied *Bostock* and other binding precedents, and Defendants' objection is nothing more than a repackaging of the arguments already rejected by the Magistrate Judge.

#### A. *Bostock* Holds That Any Discrimination Based on Sexual Orientation Is Discrimination on the Basis of Sex.

At the start, Defendants overlook that *Bostock* controls the outcome here at a basic level. *Bostock*'s actual holding is unambiguous: "it is impossible to

discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 590 U.S. at 660. As the Supreme Court emphasized, "[d]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Id.* at 669. Nothing in *Bostock*'s language limits this holding to cases where a literal sex-flip produces a different outcome by operation of the same policy terms. The sex-flip hypothetical the Court provided is a *demonstration* meant to show why discrimination on the basis of an individual's sexual orientation is also always discrimination "because of" the individual's sex, not a mandatory gating test separate from *Bostock*'s actual holding.

Here, Defendants' Medical Plan facially discriminates against Plaintiff because she is a lesbian. The only way Plaintiff could access fertility benefits was by paying out-of-pocket for at least six cycles of IUI treatments to satisfy the Plan's definition of "infertility," whereas heterosexual women can meet the definition by engaging in heterosexual male-female intercourse over several months without producing a pregnancy, a cost-free option that is foreclosed to Plaintiff solely because of her sexual orientation. (SAC ¶¶ 17–23, 27–28.) This is discrimination based on sexual orientation and, therefore, discrimination on the basis of sex. *Bostock*, 590 U.S. at 660, 669. No further analysis is required to determine that Plaintiff has adequately alleged that Defendants subjected her to a

policy that facially discriminates against her because of her sex, in violation of Title VII.

### B. The R&R Correctly Applied the *Bostock* But-For Test.

Even accepting Defendants' insistence that the Court must apply the sex-flip test of *Bostock* to the facts of this case, the R&R correctly performed that analysis. In the *Bostock* test, the pertinent question is whether the challenged policy or practice would continue to negatively affect the plaintiff if the plaintiff's sex was flipped. *Bostock*, 590 U.S. at 656. If the answer is "no," then but-for discrimination "because of" the individual's sex is revealed, and the policy or practice fails the test. *Id.* ("a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.").

Magistrate Judge Bly's application was straightforward: Plaintiff is a woman attracted to women. To qualify for fertility benefits, she must first pay out-of-pocket for cycles of artificial insemination. Now flip one thing—her sex—and Plaintiff would be a man attracted to women. The hypothetical male Kulwicki would not himself be subject to the requirement of paying out-of-pocket for artificial insemination cycles before qualifying for fertility benefits under Defendants' Medical Plan. (SAC ¶¶ 19, 27.)

As the R&R correctly explains, "[t]hose costly, time-consuming requirements only apply to women … And they apply without regard to the sexual

orientation of the plan member. That, it seems, is facial discrimination based on gender, and the analysis could probably end here." (R&R at 11–12; *see also id*. at 14.) Indeed, performing the *Bostock* test the way Defendants insist it should be done—by flipping only Plaintiff's sex and stopping there—leads to the inescapable conclusion that Plaintiff would not be subjected to the policy she complains of if she were a man. (*Id.* at 14.) Magistrate Judge Bly was therefore correct in recommending denial of Defendants' motion to dismiss.

Defendants protest that a male Kulwicki would not be "eligible" for the same IUI/IVF benefits because the Medical Plan language restricts certain benefits to "eligible covered female" participants. (Defs.' Objs. at 6.) But as the R&R explains correctly, this argument misses the point, and is not a panacea for Defendants' position. (R&R at 15.) The fact that a hypothetical male Kulwicki would not personally undergo IUI or IVF does not mean Defendants' Plan is nondiscriminatory under the *Bostock* test. If anything, it indicates that Defendants' understanding of how the test works was too narrow. Plaintiff was seeking to achieve pregnancy, which was a possibility for her only with procedures such as IUI and IVF, which were covered by the Medical Plan and were accessible to her only by first paying for at least six cycles of IUI. It would not be a useful application of *Bostock* to flip her sex to male, but take away the fact that she was seeking to access IUI and IVF treatments by establishing that she met the Medical

Plan's definition of infertility. The question at the heart of the case is not answered by pointing out that men themselves do not receive IUI or IVF.

To usefully perform the test, it is perfectly acceptable to flip Kulwicki's sex but maintain in the equation the existence of a person capable of pregnancy who would be the recipient of the IUI or IVF treatments; in other words, to accurately perform the test, the male Kulwicki could be given a female partner covered by Defendants' Medical Plan. This does not "unwind" the test as Defendants' claim (Defs.' Objs. at 7); instead, it allows the test to function by keeping *more* variables constant (such as the fact that the Plaintiff is seeking to achieve pregnancy specifically via fertility treatments such as IUI or IVF), rather than eliminating them and claiming the test is passed because men themselves don't need those procedures.

Both Supreme Court precedent illustrates that the flip test can be fleshed out in such a way so as to create the next-closest analogue that allows for an all-fours comparison of how the challenged policy affects the plaintiff because of his or her sex. A clear illustration of this is in *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669 (1983). In that case, a male employee claimed that he was unlawfully discriminated against because of his sex. His employer's health plan "provided the same hospitalization coverage for male and female employees themselves for all medical conditions, but it differentiated between female

employees and spouses of male employees in its provision of pregnancy-related benefits." *Id.* at 672. Specifically, the plan limited coverage to $500 of hospital charges related to the pregnancy of a male employee's covered spouse, but contained no such limitation on female employees or any hospitalization-related charges incurred by the covered male spouse of a female employee. *Id*.

Under the approach to Title VII that Defendants advocate, application of the "flip one thing only" *Bostock* test to the facts of that case would mean the policy was non-discriminatory. If the sex of the male plaintiff were flipped alone, the male employee would become a female employee and the spouse would remain female. But there would be no difference in outcome because the challenged benefit limitation applied to covered female spouses; flipping the employee's sex alone would not reveal a different treatment because the spouse's sex would remain the same, the pregnancy hospitalization benefit limitation would still apply.

Of course, same-sex marriages were not legally recognized at the time, so the Supreme Court did not even consider this type of strict "flip one thing only" test that Defendants insist is required. Instead, the Court took a different approach to the case, using the more obvious variation at the time: flip the sex of both the employee and the spouse, maintaining their sexual orientation, so the male employee with a female spouse would be compared to a female employee with a male spouse. This revealed a sex-based difference: "the husbands of female

employees receive a specified level of hospitalization coverage for all conditions; the wives of male employees receive such coverage except for pregnancy-related conditions." *Id.* at 684.

Defendants' argument is that this variation of the test is improper because it changes more than one variable, but Defendants also argue that in any event it would reveal no discrimination because men cannot get pregnant and would not be eligible for any pregnancy-related hospital charge coverage. (Defs.' Objs. at 6) ("as a male, Kulwicki would **not** be eligible for the benefits sought by Plaintiff because by their explicit terms they are only available to females.") (emphasis in original). In other words, according to Defendant, flipping Kulwicki's sex to male does not reveal discrimination in this case because only women can get pregnant.

The Supreme Court confronted that issue in *Newport News* and explained that "Congress has unequivocally rejected that reasoning" in Title VII cases by amending the statute in 1978 with the Pregnancy Discrimination Act, for the explicit purpose of overruling *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), which relied on similar logic. *Newport News*, 462 U.S. at 684; *id.* at 670–71. Thus, comparing the benefits available to male employees by way of their covered female spouses to the benefits available to female employees by way of their male spouses led the Court to identify unlawful discrimination because of sex, *id.* at 684–85, notwithstanding the inability of a pure "flip one thing only" test to

show the disparity.

Applying either variation of the *Bostock* test to Kulwicki's case reveals the inverse of the *Newport News* fact pattern. Instead of a male employee's covered spouse receiving *less* favorable healthcare benefits than a female employee, as was the case in *Newport News*, here it is Kulwicki, a female employee, who receives less favorable access to healthcare benefits when compared to *either* a male employee or a male employee's female covered spouse. Either of them could access IUI and IVF benefits without paying out-of-pocket; Kulwicki cannot.

### C. *Lange* Does Not Help Defendants—It Confirms Plaintiff's Position.

Defendants argue that the Eleventh Circuit's en banc decision in *Lange v. Houston Cnty.*, 152 F.4th 1245 (11th Cir. 2025), requires the Court to reverse the R&R. (Defs.' Objs. 5–9.) To the contrary, *Lange* confirms the R&R's approach.

In *Lange*, the court held that a health insurance policy prohibiting sex-change treatments did not discriminate based on sex because the policy excluded the same treatments regardless of whether the employee was a natal man or a natal woman—neither sex was entitled to coverage. *Lange*, 152 F.4th at 1252–53.

Critically, the *Lange* court specifically noted what *would* constitute discrimination: requiring employees in a protected class "to pay more than nontransgender employees or that transgender employees or their dependents receive reduced benefits." *Id.* at 1253. That is *exactly* what Defendants do here.

Lesbian employees must pay more than male employees (or heterosexual female employees, or heterosexual female covered spouses of male employees) to gain access to the same fertility benefits. The R&R was correct when it found this case falls within the example contemplated by *Lange*, not within its holding. (R&R at 17–18) ("Plaintiff argues, and the Court agrees, that the plan provision at issue here is more akin to the exception noted in *Lange* (here, lesbian employees must pay more than non-lesbian employees in order to access infertility benefits.").[1]

Moreover, the *Lange* court itself performed the analysis the R&R adopted—it looked to the "anatomically-correct, opposite-gender dependent of the flipped person" *even though* the gender-flipped individual could not personally undergo the procedure at issue. *Lange*, 152 F.4th at 1252 ("[s]ome of those procedures would be impossible for a person with a female anatomy to undergo."). So, just as the Supreme Court did in *Newport News*, the *Lange* court also adjusted the flip test to make it useful in the scenario presented, rather than adhere to an overly literal "flip one thing only" approach that Defendants wrongly insist is required, or determining that the policy is nondiscriminatory under the flip test simply because the hypothetical flipped plaintiff would not seek the sex-specific procedure at

---

[1] Contrary to Defendants' suggestion (Defs.' Objs. at 9), the R&R was not actually claiming that *Lange* identified an "exception" to *Bostock* that applies to this case. Instead, the R&R was referring to the *example* given in *Lange* of a policy that required transgender employees to pay more than nontransgender employees.

issue. *See Lange*, 152 F.4th at 1252 (noting that although the plaintiff was a natal man seeking a sex change surgery including "creation of a neovagina," the *Bostock* flip could still be applied by comparing a natal woman seeking a sex change to male *or* by comparing a natal woman seeking a neovagina, "perhaps as a reversal of a previous female-to-male sex change"). Although the court had to adjust more than one variable to perform the test, it did so and explained how the result would still be the same.

The R&R appropriately applied that same framework here: although a male Kulwicki would not personally undergo IUI or IVF, the analysis can still be performed by looking to the next-closest analogues—either the male's ability to access any male-oriented treatments that require him to satisfy the Plan's "medical definition" of infertility (if he even must do so at all), *or* looking at a hypothetical male Kulwicki seeking to obtain pregnancy with a covered female partner. (R&R at 11–15). In either case, would Defendants' use of its definition of "infertility" *force* the flipped Kulwicki to pay out of pocket for 6 to 12 cycles of IUI before accessing infertility benefit coverage? It would not. The sex-flip produces a different outcome, as Magistrate Judge Bly correctly noted. (R&R at 17) ("the hypothetical male Plaintiff (and his covered female dependent) would have the cost-free coitus option to qualify for infertility coverage under Defendants' plan."). *Bostock* is satisfied.

Defendants' objection that *Lange*'s reference was to a minor child, not a spouse, does not bear the weight placed on it. (Defs.' Objs. at 8 n. 5). The analytical principle—looking to the covered dependent of the flipped person when the flipped person cannot personally access the treatment—applies with equal logic to a flipped covered spousal dependent, as illustrated directly by *Newport News*, 462 U.S. at 683–84. Whether the dependent in a flip scenario is a child or an adult is not material to how the Supreme Court or the Eleventh Circuit has utilized the test.

For these reasons, the R&R correctly recommends denial of Defendants' motion to dismiss the disparate treatment claim, and Defendants' objections are without merit.

## II. The R&R Correctly Recommends Sustaining Plaintiff's Disparate Impact Claim.

Magistrate Judge Bly analyzed Plaintiff's disparate impact claim both on the basis that it is an adequately pled alternative under Rule 8(d)(2) *and* on the independent ground that the SAC plausibly alleges each element. (R&R at 22–26.) Defendants' objections should be overruled.

Defendants do not dispute that Rule 8(d)(2) permits alternative and inconsistent pleading. (Defs.' Objs. at 10–11.) Yet they assert that the R&R "bootstrapped" the disparate impact claim onto the disparate treatment claim in violation of *Twombly* and *Iqbal*. (*Id.*) This objection mischaracterizes the R&R's

reasoning and the law.

Rule 8(d)(2) expressly provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically" and that "[i]f a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). The same facts that support Plaintiff's disparate treatment claim—the Medical Plan's infertility definition, the cost-of-access barrier it imposes exclusively on lesbian women, and the absence of any such barrier for men or heterosexual women—also form the factual basis of her alternative disparate impact claim. Magistrate Judge Bly did not "immunize" the disparate impact claim from scrutiny; he recognized that a complaint may plead both theories in the alternative and that the same core facts can sustain both.

Defendants argue that the R&R is logically inconsistent because it simultaneously found the infertility definition to be "facial discrimination based on gender" and treated it as a "facially neutral" practice for disparate impact purposes. (Defs.' Objs. at 12–14) (Plaintiff cannot have it both ways: either the definition is facially discriminatory … or it is facially neutral."). At the Rule 12 stage, yes, Plaintiff can maintain two claims on alternate theories, and the court can address the sufficiency of the pleadings as to each without regard to their inconsistency. That is explicitly permitted by Rule 8(d)(2) and (3). Plaintiff's complaint explains that she pleads her disparate impact claim "in the alternative" to her disparate

treatment claim "to the extent Defendants deny the existence of a facially discriminatory policy on the basis of sexual orientation." SAC ¶ 58. Defendants maintain that structuring the Medical Plan so that it uses the infertility definition as a qualifier for IUI and IVF benefits is facially neutral, so Plaintiff is entitled to maintain her disparate impact claim at this stage.

The R&R's statement that, based on Plaintiff's allegations, the plan's disparate treatment of men and women "is facial discrimination based on gender, and the analysis could probably end here" (R&R at 12) does not mean the court is required to immediately dismiss Plaintiff's alternate disparate impact claim. The Federal Rules expressly permit a plaintiff to assert both theories simultaneously, and Defendants cite no authority holding that a complaint must elect one or the other at the pleading stage, or that a court must dismiss a disparate impact claim if the plaintiff also successfully alleged a disparate treatment claim. The R&R correctly preserved both alternatives for further proceedings.

Plaintiff has clearly and specifically identified the Medical Plan's "medical definition of infertility" as the employment practice causing the alleged disparate impact. SAC ¶ 59 ("Defendants' Medical Plan's adverse impact against lesbians stems from the Medical Plan's utilization of a 'medical definition of infertility' that makes it impossible for lesbians to qualify for coverage of fertility treatment benefits such as IUI and IVF without first paying out-of-pocket for a requisite

number of artificial insemination cycles.”). Magistrate Judge Bly agreed: “Plaintiff has clearly pled a particular employment practice—the medical plan’s definition of infertility.” (R&R at 25.)

Defendants assert that the infertility definition is not an “employment practice” but rather a “benefit-plan eligibility criterion.” (Defs.’ Objs. at 12.) This distinction has no legal support. Employer-sponsored benefit plans are conditions of employment subject to Title VII’s anti-discrimination protections. *Newport News*, 462 U.S. at 682 (1983) (“[H]ealth insurance and other fringe benefits are ‘compensation, terms, conditions, or privileges of employment’” under Title VII); *City of Los Angeles, Dep’t of Water and Power v. Manhart*, 435 U.S. 702, 704 (1978) (pension fund contribution requirement constituted discriminatory “condition of employment” under Title VII). Accordingly, the “eligibility criterion” of such plans are necessarily within Title VII’s ambit, as such criterion directly impact an employee’s ability to actually access the benefits. There is no principled basis for distinguishing a benefit-plan eligibility criterion from any other employment practice. The R&R’s conclusion was correct.

Defendants argue that Plaintiff failed to plead statistical disparity with sufficient specificity and that this deficiency cannot be cured by discovery. (Defs.’ Objs. at 14–18.) Both contentions fail.

As to the pleading standard, this Court and the Eleventh Circuit have

consistently held that detailed statistical evidence is not required at the motion to dismiss stage. "Circumstantial evidence, complemented by judicial notice to show that a facially neutral policy must in the ordinary course have a disparate impact on a protected group of which an individual plaintiff is a member, is often utilized." *Craig v. Ala. State Univ.*, 804 F.2d 682, 687 n.7 (11th Cir. 1986) (quoting *Mitchell v. Board of Trustees of Pickens Cty.*, 599 F.2d 582, 585 n.7 (4th Cir. 1979)).

Courts in this District have expressly found that a plaintiff did not fail to state a claim of disparate impact "because he did not allege the exact statistical disparity" because "that information becomes available during discovery, not prior to [the plaintiff] filing suit.'" *Walden v. Raimondo*, No. 5:21-CV-304 (MTT), 2024 WL 625231, at 5 (M.D. Ga. Feb. 14, 2024). And at the Rule 12 stage, "all [the plaintiff] must do is allege '*some* statistical disparity, however elementary.'" *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1304 (M.D. Ala. 2019) (quoting *Brady v. Livingood*, 360 F. Supp. 2d 94, 100 (D.D.C. 2004)).

Plaintiff has done far more than allege "some" disparity. She has alleged with precision that *every* lesbian employee covered by the Medical Plan must pay for at least six cycles of artificial insemination before qualifying for fertility coverage, while *no* male employee and *no* heterosexual female employee faces that structural barrier as a matter of the Plan's express terms. SAC ¶¶ 17–20, 28, 59.

The Court may take judicial notice of the plain meaning of the Plan's text to confirm that this disparity is not speculative—it is inherent in the Plan's design. *Craig*, 804 F.2d at 687 n.7.

Defendants' complaint that Plaintiff's "zero lesbians" allegation is a "logical tautology" rather than statistical evidence (Defs.' Objs. at 15–16) is unavailing. The fact that a policy negatively impacts 100% of a protected class does not make the statistical allegation circular—it makes it powerful. A policy prohibiting women (but not men) from wearing pants at work affects 100% of women; that unanimity is not a flaw in the discrimination claim and a plaintiff challenging such a policy would not need to conduct pre-discovery surveys of the female employees to sufficiently allege a disparate impact. Defendants cite no case holding that the breadth of a policy's discriminatory effect defeats a disparate impact claim. The R&R correctly found this allegation sufficient. (R&R at 25–26.)

As to Defendants' argument that statistical data is "inherently unobtainable" (Defs.' Objs. at 17–18), this is itself speculative, factually premature, and legally irrelevant at the pleading stage. Whether useful statistical data can be obtained through discovery is a matter for discovery management, not for a resolution on a motion to dismiss on a purely predictive basis.

Defendants argue that permitting "lesbian employees" as a comparison group for disparate impact purposes would "effectively create sexual orientation as

an independent protected class." (Defs.' Objs. at 18–19.) This argument is foreclosed by *Bostock*. Because *Bostock* held that discrimination based on sexual orientation necessarily constitutes sex discrimination, 590 U.S. at 660, a policy that has a disparate impact on lesbian employees—by operation of their sex and sexual orientation—has a disparate impact on the basis of sex. The comparison group is properly defined. Defendants' proposed rule that disparate impact comparisons must be limited to "men and women" as undifferentiated groups would undermine the entire framework that *Bostock* established and allow employers to perpetuate facially neutral practices that specifically burden a sex-based subgroup while claiming that aggregate male/female statistics show no disparity. Neither *Bostock* nor Title VII countenance such a result.

**III. Magistrate Judge Bly Correctly Declined to Dismiss Plaintiff's Class Allegations.**

Defendants object that the R&R deferred ruling on class certification despite acknowledging "real concerns" about whether the class is certifiable, and that the proposed class definition is facially deficient. (Defs.' Objs. at 19–25). These objections should be overruled.

The Eleventh Circuit has expressly held that "class certification is an evidentiary issue, and it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Herrera v. JFK Med. Ctr. Ltd. P'ship*, 648 F. App'x 930, 934 (11th Cir. 2016) (citation and

quotation marks omitted). "In fact, the determination usually should be predicated on more information than the complaint itself affords." *Id.* (citation and quotation marks omitted). The R&R faithfully applied this controlling precedent. (R&R at 28–29.)

Dismissal of class allegations at the pleading stage is "an extreme remedy appropriate only where . . . it will be impossible to certify the classes alleged by the plaintiff regardless of the facts the plaintiff may be able to prove." *Fitzer v. Am. Inst. of Baking*, No. 2:09-cv-169, 2016 WL 4223612, at *11 (S.D. Ga. Aug. 9, 2016) (citations and quotation marks omitted). Defendants have not made that showing. To the contrary, the R&R correctly found that "this is not the sort of case where it is obvious from the pleadings that the individual issues would overwhelm the common issues." (R&R at 29.) The central question—whether the Medical Plan's uniform infertility definition discriminates on the basis of sex—is a common question capable of class-wide resolution in a single stroke. Its affect on individuals similar to Plaintiff is apparent on its face, and if it discriminates because of her sex, then it does so for any other lesbian employee of Defendants.

That the Magistrate Judge expressed "real concerns" about ultimate certification does not mean those concerns are appropriately resolved without discovery. A court may have preliminary concerns about a number of issues that discovery will illuminate or dispel. *See Herrera*, 648 F. App'x at 934. Concerns

are not equivalent to the "impossibility" of certification that would justify dismissal at this stage.

Defendants argue that the proposed class of "lesbian individuals" is not adequately defined and clearly ascertainable because sexual orientation is self-identified and not recorded in employment records. (Defs.' Objs. at 20–22.) This argument is premature and, in any event, overstated.

Courts across the country have certified—or at least allowed to proceed—classes defined by characteristics that require individualized inquiry to confirm, including characteristics involving sexual orientation, gender identity, and disability status. The ascertainability requirement does not demand that class membership be determinable from employer records alone. Rather, it requires that the class be defined using objective criteria susceptible to determination. Here, lesbian individuals who submitted claims for fertility benefits and were denied—or paid out-of-pocket—are, at this stage, plausibly identifiable through plan records, self-identification, and standard class-action discovery mechanisms. Whether the specific discovery tools employed in this case will yield a certifiable class is a question for Rule 23 briefing and the certification stage.

Moreover, Defendants' invocation of the challenge of identifying class members cuts both ways: if Defendants' records truly cannot identify lesbian employees, then requiring each affected individual to litigate individually would be

both impracticable and contrary to Title VII's class-based remedial goals, and certification under Rule 23(b)(2) would be perfectly appropriate. The impossibility of individual identification strengthens the case for class treatment, not against it.

Defendants argue that Rule 23(b)(2) is unavailable because the proposed class includes former employees (who cannot seek injunctive relief under *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)) and because Plaintiff seeks individualized monetary damages. (Defs.' Objs. at 24–25.) Defendants further argue that Rule 23(b)(3) fails for lack of predominance. (*Id.*)

These arguments are precisely the sort best resolved at the class certification stage, with the benefit of a developed record and full adversarial briefing. *See Herrera*, 648 F. App'x at 934. Plaintiff pled class treatment under Rules 23(b)(2) and (3). SAC ¶ 38. Whether the ultimate certification motion proceeds under (b)(2), (b)(3), or a combination is a strategic and evidentiary determination that cannot and should not be made on the face of the complaint alone. The R&R correctly declined to resolve these complex questions without the benefit of discovery.

## **CONCLUSION**

For these reasons, Plaintiff respectfully asks this Court to adopt Magistrate Judge Bly's Non-Final Report and Recommendation in full, and deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted:

/s/ Jamisen A. Etzel
Gary F. Lynch (*p.h.v.*)
Jamisen A. Etzel (*p.h.v.*)
**LYNCH CARPENTER, LLP**
1133 Penn Ave.
Pittsburgh, PA 15232
Tel.: (412) 322-9243
Fax: (412) 231-0246
gary@lcllp.com
jamisen@lcllp.com

MaryBeth V. Gibson
Georgia Bar No. 725843
**GIBSON CONSUMER LAW GROUP, LLC**
4729 Roswell Road, Suite 208-108
Atlanta, GA 30342
Tel.: (678) 642-2503
marybeth@gibsonconsumerlawgroup.com

Colleen E. Ramage (*p.h.v.*)
**RAMAGE LYKOS, LLC**
525 William Penn Place, 28th Floor
Pittsburgh, PA 15232
Tel.: (412) 325-7700
Fax: (412) 325-7755
cramage@ramagelykos.law

*Attorneys for Plaintiff*