**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Tara M. Kulwicki,

Plaintiff,

v. Case No. 1:24-cv-4658-MLB

Cobb Hospital, Inc. and Wellstar Health System, Inc.,

Defendants.

________________________________/

**OPINION & ORDER**

Plaintiff Tara Kulwicki is a lesbian who wants to have a child. Her employers (Defendants Cobb Hospital, Inc. and Wellstar Health System, Inc.) offer a medical insurance plan that provides treatment for female infertility. To access that benefit, a woman must establish her infertility by having procreative sex for some time without conception or by paying for other reproductive treatments that fail. As a lesbian, Kulwicki cannot have procreative sex. She may only prove infertility by paying for treatments. Believing that discriminates against her because of her sex and sexual orientation, she filed this action on behalf of herself and a

class of insureds under Title VII of the Civil Rights Act of 1964. (Dkt. 46.) She asserts both a disparate treatment claim (Count I) and a disparate impact claim (Count II). (*Id.* ¶¶ 45–53, 54–63; 46-2 at 70–72 (medical plan).)[1]

Defendants move to dismiss, arguing the but-for test in *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020), shows Plaintiff's claims fail as a matter of law. (*See* Dkt. 47.) A Magistrate Judge issued a Non-final Report and Recommendation ("R&R") applying *Bostock's* but-for test, concluding Defendants' insurance plan treats Plaintiff differently because of her sex and sexual orientation, and recommending the Court deny Defendant's motion to dismiss. (Dkt. 50 at 10–22.) Defendants objected, and Plaintiff responded. (Dkts. 52, 53.) The Court sustains Defendants' first objection, rejects the R&R, and grants Defendants' motion to dismiss.

[1] The Court recognizes its review on a motion to dismiss is typically "limited to the four corners of the complaint." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009). But it may still consider the medical plan because Plaintiff attached it to the complaint. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); (Dkts. 46 ¶ 11; 46-2.)

## I. Legal Standards

### A. R&Rs

28 U.S.C. § 636(b)(1) requires district courts to "make a de novo determination of those portions of [an R&R] to which objection is made." Any such objection "must specifically identify the portions of the [R&R] to which objection is made and the specific basis for objection." *McCullars v. Comm'r, SSA*, 825 F. App'x 685, 694 (11th Cir. 2020)[2]; *see United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009) ("[A] party that wishes to preserve its objection must clearly advise the district court and pinpoint the specific findings that the party disagrees with."). "Frivolous, conclusive, or general objections need not be considered by the district court." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988).

### B. Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

[2] The Court recognizes *McCullars* is unpublished and not binding. The Court cites it and other unpublished cases nevertheless as instructive. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II. Discussion

### A. Threshold Issue: The Meaning of *Bostock*

Though everyone agrees *Bostock* controls, no one agrees what it means or requires. Defendants argued before the Magistrate Judge that *Bostock* requires the court to switch Plaintiff's *sex* and see whether the plan discriminates against her, while Plaintiff argued *Bostock* only requires the court to see whether the plan discriminates on the basis of *sexual orientation*. (*See* Dkts. 47 at 2–5; 48 at 7–9.) The Magistrate Judge agreed with Defendants' characterization and applied the but-for test by flipping only her sex. (Dkt. 50 at 12–14.) Despite the Magistrate Judge concluding her claims can continue, Plaintiff disputes this framework, latches onto the supposedly "unambiguous" holding in *Bostock*, and says "[n]othing in *Bostock*'s language limits this holding to cases where a literal sex-flip produces a different outcome by operation of the same policy terms." (Dkt. 53 at 6.) She suggests the but-for test in *Bostock* was not a necessary part of its "holding" that discrimination based on sexual orientation necessarily entails discrimination based on sex, and this Court need not perform it to find discrimination. (*Id.* at 1–

2.) Alternatively, she says—even under the but-for test—the case is simple and she wins: as a homosexual woman she cannot access fertility benefits by having and failing procreative sex (the so-called "free option"); flip her sexual orientation and she becomes a heterosexual woman; a heterosexual woman can access infertility through the free option; ergo Defendants treat her differently because of her sexual orientation (vis-à-vis her sex). (*See id.* at 6–7 (flipping the sexual orientation of the comparator but keeping her sex constant).)

The Court rejects Plaintiff's understanding of *Bostock*. In that case, the Supreme Court did not make sexual orientation (or transgender status) a protected characteristic independent of sex. *See Bostock*, 590 U.S. at 655 ("The only statutorily protected characteristic at issue in today's cases is 'sex[.]'"); *see also Lange v. Houston Cnty.*, 152 F.4th 1245, 1252 (11th Cir. 2025) ("Neither the Supreme Court nor this Court has held that transgender status is separately protected under Title VII apart from sex. And *Bostock* did not add transgender status, as a category, to the list of classes protected by Title VII.").[3] Nor did *Bostock*

[3] If Plaintiff's expansive reading of *Bostock* held true, the Eleventh Circuit could not have said that in *Lange*. Indeed, the very "holdings"

construe the word "sex" to include necessarily sexual orientation. *See* 590 U.S. at 655 (declining to adopt competing definitions of "sex" because "nothing in [its] approach to the[] case[] turns on the outcome of the [] debate" and a party conceded for argument's sake the point).

More importantly, the Supreme Court used the but-for test to identify discrimination on the basis of sex—not sexual orientation as Plaintiff suggests. *Bostock* explains that the "but-for test directs [a court] to change one thing at a time and see if the outcome changes. If it does, [a court has] found a but-for cause." *See* 590 U.S. 644. If application of that test to a plaintiff's sex confirms "the plaintiff's sex was one but-for cause of [the decision at issue], that is enough" to show illegal discrimination. *Id.* Driving that point home, the Supreme Court explained that, if an employer "intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put

---

she cites in *Bostock* included sexual orientation ***and*** transgender status (Dkt. 53 at 5–6): "it is impossible to discriminate against a person for being *homosexual* ***or*** *transgender* without discriminating against that individual based on sex"; and "discrimination based on *homosexuality* ***or*** *transgender status* necessarily entails discrimination based on sex." *Bostock*, 590 U.S. at 660, 669 (emphases added). So fidelity to *Bostock* requires flipping the person's sex, not sexual orientation.

differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Id.* at 659-60. The Supreme Court, interpreting the phrase "because of . . . sex" under Title VII, held that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex." *See* 590 U.S. at 660–61, 665, 669. So, according to *Bostock*, sexual orientation only gets swept in through application of the but-for test to a plaintiff's "sex." *See id.* at 660–61, 681.

That explains why the many examples discussed in *Bostock* flipped the individual's sex—the only protected characteristic at play. *See* 42 U.S.C. §§ 2000e-2(a)(1), (k)(1)(A) (prohibiting discrimination because of one's "sex," not sexual orientation); *see also Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 271 (1st Cir. 2022) ("We take from the Court's analysis in *Bostock*, which is rooted in Title VII's language, that when assessing a Title VII discrimination claim, the proper focus is on the protected characteristic of the individual plaintiff."). This well-established concept of flipping the protected trait to locate discrimination should come as no surprise to anyone. *See Murray v. UBS Sec., LLC*, 601 U.S. 23, 34 (2024) ("Prohibited discrimination occurs when an employer intentionally treats

a person worse because of a protected characteristic."); *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012) ("A plaintiff can establish liability under this section by proving that a *protected characteristic* was a but-for cause of the adverse employment action." (emphasis added)); *Abdallah v. Mesa Air Grp., Inc.*, 83 F.4th 1006, 1014 (5th Cir. 2023) ("The 'simple test' for determining whether disparate treatment has occurred is 'whether the evidence shows treatment of a person in a manner which but-for that person's [*protected characteristic*] would be different.'" (emphasis added)). Even today, binding authority citing *Bostock* confirms that courts must flip the sex (the protected characteristic) to assess causation. *Lange*, 152 F.4th at 1251 ("The Supreme Court has held that Title VII prohibits employers from firing employees on the basis of homosexuality or transgender status when discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex."); *United States v. Skrmetti*, 605 U.S. 495, 521 (2025) ("*Bostock* held that, in such a circumstance, sex is the but-for cause of the employer's decision—change the homosexual male employee's sex and he becomes a straight female whose attraction to men the employer tolerates.").

The Court cannot elevate *Bostock*'s statement that discrimination on the basis of sexual orientation entails discrimination on the basis of sex without considering how the Supreme Court got there (the but-for test isolating sex as a possible basis for discrimination). The reasoning and methodology underlying *Bostock* bind the Court just as much as any one line from the opinion. *See United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017) ("The holding of a case comprises both the result of the case and *those portions of the opinion necessary to that result*." (emphasis added)). The upshot from this discussion is clear: faithful application of *Bostock* requires flipping one thing—Plaintiff's sex—and deciding whether the plan treats her differently on that basis. The Court thus rejects Plaintiff's framing and follows *Bostock*'s methodology.

### B. First Objection: Proper Application of *Bostock*

#### 1. Application of *Bostock* in the R&R

In the R&R, the Magistrate Judge applied *Bostock*'s but-for test by flipping Plaintiff's sex from female to male to see whether Plaintiff

plausibly alleged discrimination based on sex. (Dkt. 50 at 14–22.)[4] He advanced two alternative scenarios which supposedly show discrimination: (1) a hypothetical male Kulwicki needn't meet any definition of "infertility" to obtain coverage (whereas the real Kulwicki must), or (2) a hypothetical male Kulwicki's *spouse* could get coverage by engaging in procreative sex for some time (whereas the real Kulwicki and her hypothetical female spouse cannot and must pay for procedures). (*Id.* at 14–18.)

[4] Two related points. First, the Court discusses Counts One and Two together as they rely on nearly identical allegations and theories of discrimination. (*See* Dkt. 46 ¶¶ 45–53, 58 (pleading Count II "[i]n the alternative to Count I, and to the extent Defendants deny the existence of a facially discriminatory policy on the basis of sexual orientation against Plaintiff and the putative [c]lass").) The Court also does so because no one disputes that *Bostock* is a threshold issue for both claims. (*See* Dkt. 47 (section in motion to dismiss titled, "Whether pled as a claim for disparate treatment (Count I) or disparate impact (Count II) Plaintiff's claim must meet the but-for test and, because it does not, Plaintiff fails to state a claim" (capitalization omitted)); 48 at 6–12 (arguing both claims satisfy *Bostock*).) Second, no one disputes—or has ever disputed—*Bostock*'s but-for test controls the analysis at this stage. (*See* Dkts. 36 at 6–10; 39 at 12–19 (response to previous motion to dismiss engaging with *Bostock* and concluding her allegations "clearly satisfy [*Bostock*'s] simple test"); 47 at 1–5; 48 at 6–17 (response to renewed motion to dismiss saying the claim satisfies the but-for test); 53 at 7–15 (arguing the Magistrate Judge properly applied *Bostock*).) So the Court only evaluates whether the purported discrimination satisfies the test.

Defendants say neither works. On the first scenario, they say the Magistrate Judge misunderstood Plaintiff's claim and, in any event, the part of the plan she relies on covers only *female* infertility. (*See* Dkt. 52 at 2–6.) And on the second, they say (among other things) the Magistrate Judge improperly applied the test to the covered spouse scenario by "considering the situation from the perspective of a male Kulwicki's hypothetical heterosexual female partner," and the case he cites to support this move—*Lange*, 152 F.4th at 1252—doesn't allow that second shift. (*Id.* at 7–9.) The Court agrees with Defendants.

Both scenarios misapply *Bostock*. Start with the first. The Magistrate Judge concludes the plan discriminates on its face because "[m]en need not meet any definition of 'infertility' to qualify for [fertility] benefits" but women must by "demonstrat[ing] an inability to get pregnant after 6 or 12 months" of procreative sex or "6 or 12 cycles of artificial insemination." (Dkt. 50 at 11–12, 14.) As part of this, he accepts two allegations Plaintiff makes about coverage for male infertility:

- "Men do not need to meet any specific definition of 'infertility' to qualify for coverage of fertility treatments and expenses under the language of the [m]edical [p]lan."
- "Heterosexual men (in fact, any men) are not required to meet any such 'definition' before gaining access to

> infertility treatments. At most, the only barrier or burden that the language of the [m]edical [p]lan suggests for men is that a heterosexual man and his female partner might be required to tell a medical professional they have engaged in six or twelve months of timed, unprotected heterosexual intercourse to establish the female partner's eligibility for treatment."

(*Id.* (citing Dkt. 46 ¶¶ 19, 27).) Noting the complaint's lack of factual allegations about treatment for male infertility and making sure it gave Plaintiff all reasonable inferences from her well-pleaded facts, the Court asked Plaintiff the basis for her contention that men don't need to meet any definition of infertility to qualify for coverage. (Dkt. Order Aug. 17, 2026.) Plaintiff identified no plan provision but rather explained that, since the plan only defines infertility in terms of women, men "need not meet any definition of 'infertility' to access benefits at all" or, alternatively, would do so "by showing a female partner meets the definition." (Dkt. 54 at 2.) The first alternative is illogical (or not a plausible inference) as it assumes benefits for male infertility. And the second would establish only female infertility under the plain language of the plan. Because Plaintiff cites no portion of the plan providing

treatment for male infertility, she does not plausibly allege men receive such coverage with fewer barriers than she faces.

The Court also does not accept Plaintiff's allegations about coverage for male infertility because they are legal conclusions—about the terms of a contract—cloaked as facts. *See Iqbal*, 556 U.S. at 678 ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Plaintiff simply frames her theory of contractual interpretation as a factual allegation. *See Gray v. Bd. of Regents of Univ. Sys. of Ga.*, 150 F.3d 1347, 1351 n.3 (11th Cir. 1998) ("Interpretation of a contract is a question of law."); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("What a contract provision means, or whether it is ambiguous, are questions of law[.]"); *see, e.g.*, *Chenkin v. 808 Columbus LLC*, 368 F. App'x 162, 164 (2d Cir. 2010) ("Insofar as [plaintiff] argues on appeal that the district court erred in declining to accept as true the 'allegations' in his complaint regarding . . . the meaning of the federal contract at issue, a court is not

required to accept as true such legal conclusions."). The Court cannot accept this camouflaged legal conclusion as true.

Her allegation about male infertility coverage also conflicts with the unambiguous language in the plan, and "[w]hen a plaintiff attaches documents to the complaint, courts are not required to accept the plaintiff's interpretation of those documents." *Kamps v. Baylor Univ.*, 592 F. App'x 282, 284 n.1 (5th Cir. 2014). The Court's "duty to accept the facts in the complaint as true does not require [it] to ignore specific factual details of the pleading in favor of general or conclusory allegations, because when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Marquez v. Amazon.com, Inc.*, 69 F.4th 1262, 1269 (11th Cir. 2023); *see also Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1218 (11th Cir. 2020) (discrediting allegations about a plaintiff's core theory because a "contract attached to [the] complaint" does not say what was alleged). "The classic example is when a plaintiff attaches a document to [the] complaint but [the] allegations about what the document . . . says contradict the document itself." *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016).

So it goes here. The plan, attached to the complaint, only discusses treatment for female infertility. It says that it covers expenses charged "by a physician to diagnose and to surgically treat the underlying medical cause of infertility," defines infertility for women in different age brackets, and explains what *women* in those brackets may do to show their own infertility. (*See* Dkt. 46-2 at 70 ("Infertility is defined as: for a woman who is under 35 years of age . . . or [f]or a woman who is 35 years of age or older . . ."); *id.*("To be an eligible covered *female* for benefits you must be covered under this SPD as a team member or be a covered dependent." (emphasis added)).) It then provides "comprehensive infertility services" that includes ovulation induction, intrauterine insemination, and (if that fails) "advanced reproductive technology" benefits that includes invitro fertilization, zygote, gamete, and cryopreserved embryo transfers; and intracytoplasmic sperm injection. (*Id.*) But, as Plaintiff tacitly concedes (Dkt. 54 at 2), the language says nothing at all about male infertility coverage. (*See* Dkt. 46-2 at 70.) It contains no provision for the treatment of male infertility. Without any well-pleaded allegations about male infertility coverage, the plain language of the attached plan controls. *Durham v. Aerial Funding, LLC*,

2022 WL 2388423, at *6 (11th Cir. July 1, 2022) ("Because [plaintiff's] allegations concerning the Modification Agreement's inclusion of the HELOC conflict with its plain language, we cannot credit [his] allegations."). In short, the Court does not assume men may obtain fertility treatment without any preconditions. Indeed, as far as the Court can tell, the plan permits no coverage for male infertility treatment. And this means the Magistrate Judge's first scenario fails to demonstrate that a hypothetical male Kulwicki would receive better coverage than she receives.

Even if the Court assumes instant coverage for male infertility, the Magistrate Judge's first hypothetical scenario—a hypothetical male Kulwicki who needn't meet any definition of "infertility" to obtain coverage (whereas Kulwicki must)—violates *Bostock* because it changes more than "one thing at a time." 590 U.S. at 656. Plaintiff is a woman who is attracted to women and may only access fertility coverage through artificial insemination. (Dkt. 46 ¶ 9, 14–17.)[5] Now, run the but-for test:

[5] As Defendants point out in their objections (Dkt. 52 at 3–4), her claim is not really about the ultimate infertility treatments and benefits available to her. Instead, her theory is the disparate ways to *access* those

flip her sex and keep everything else fixed, including what she wants: to access intrauterine insemination and in vitro fertilization treatments. (Dkt. 53 at 8–9.) Assuming men anatomically cannot receive those treatments, this scenario would require the Court to change both her sex and the kind of treatment she seeks. For example, if a hypothetical male could not *individually* receive artificial insemination or intrauterine insemination, he would be seeking some kind of treatment specific to male infertility. That's more than "one [change] at a time." *Bostock*, 590 U.S. at 656. These changed variables do not produce a similarly situated person who reflects Plaintiff's "individualistic experience." *Lange*, 152 F.4th at 1271 (Rosenbaum, J., concurring).

In sum, the first scenario falls apart given the above discussion. Because the well-pleaded allegations do not suggest how men may access infertility coverage, the plan appears to leave the hypothetical male version of Kulwicki *worse* off. Unlike Kulwicki (who at least has *a* pathway to receive coverage, albeit a costly one), the hypothetical male either gets no coverage at all or would be seeking an altogether different

---

infertility treatments and benefits. But for completion's sake the Court, as the Magistrate Judge did, addresses the point anyway.

kind of fertility treatment. This does not reveal differential treatment towards *her*. *See* 590 U.S. at 657 ("To 'discriminate against' a person, then, would seem to mean treating that individual *worse* than others who are similarly situated." (emphasis added)); *see also Abdallah*, 83 F.4th at 1013 ("Disparate treatment describes actions that treat [a plaintiff] *worse* than others based on [his] race, color, religion, sex, or national origin. Disparate impact involves practices or policies that are facially neutral in their treatment of these protected groups, but, in fact, have a disproportionately adverse effect on such a protected group." (emphasis added)). So the Court rejects the Magistrate Judge's conclusion that the first scenario reveals discrimination because of Plaintiff's sex.

Onto the second scenario—a hypothetical male Kulwicki whose *spouse* could get coverage by engaging in procreative sex for some time (whereas Kulwicki and her female spouse cannot and must pay for procedures). The Magistrate Judge reasoned the but-for test is alternatively satisfied because flipping her sex and keeping the comparator "in the same rubric Plaintiff finds herself—being stuck with having to meet the definition of infertility—the comparator could meet the definition" without incurring any costs by having sex with his female

spouse. (Dkt. 50 at 15.) Said another way, the Magistrate Judge concludes this scenario meets the but-for test "because changing Plaintiff's sex to male would result in a different choice by the employer—a male employee *and his covered female partner* would have the cost-free option of meeting the plan's infertility definition." (*Id.* (emphasis added).) Defendants say this scenario "effectively unwinds the *Bostock* test by flipping the comparator's sex back to female" and shifting "the individual seeking the medical treatment" from Plaintiff to a spouse. (Dkt. 52 at 7.)

The Court agrees with Defendants for several reasons. As an initial matter, this scenario implicates a completely different set of facts than those alleged by Plaintiff. Plaintiff alleges she wants infertility treatment. She does not allege she has a spouse or dependent, let alone one who seeks fertility treatment. She avers "[*she*] wanted to have a child by pregnancy," she sought coverage "so that *she* could conceive," and the more limited way to access infertility treatments and benefits discriminates against her (and other lesbian women) "on the basis of her sexual orientation, and, by extension, on the basis of sex." (Dkt. 46 ¶¶ 12, 22, 25, 29, 34–35, 49 ("Defendants intentionally discriminate on the basis of sexual orientation by providing, under the express terms of their

Medical Plan, stricter prerequisites to obtaining insurance benefits for fertility treatments for *Plaintiff* and the *putative [c]lass* than it does for men or heterosexual women."), 58 ("Plaintiff and the Class allege that Defendants' policy, even if facially neutral as to their sexual orientation, has (or had) an illegal and discriminatorily disparate impact on *Plaintiff* and the putative class.).) Her claims are that *she* received less favorable treatment based on her own sex (and sexual orientation), not that her spouse received less favorable treatment based on Plaintiff's sex or the spouse's own sex. The second scenario thus seems to evaluate but-for causation on some person facing a new set of circumstances, rather than Plaintiff and the allegations she includes.

Not only is this scenario unfaithful to her own complaint, it also violates the basic premise of *Bostock* to "change one thing at a time" *and* keep all else constant. 590 U.S. at 656. No matter how broadly one reads *Bostock*, courts must at least hold constant those details of an individual plaintiff based on her actual allegations, not circumstances a court finds would show discrimination to *someone*. The second scenario switches not just Plaintiff's sex, but also *who* receives the treatments under the plan. Consider closely the proffered example. Plaintiff (again) is a woman

attracted to women who may access infertility coverage through the artificial insemination pathway. (Dkt. 46 ¶¶ 9, 23.)[6] And even though she doesn't allege she has a female spouse or dependent, assume she has one. Then flip her sex and she becomes a man attracted to women.[7] But realizing the man would not seek these infertility treatments himself (perhaps because artificial insemination is anatomically impossible for men or because the plan only covers female infertility), the scenario makes another change: who receives the treatment. Indeed, the

[6] Plaintiff agrees the Court must keep constant the specific kinds of treatments she seeks to access. (*See* Dkt. 53 at 8–9 ("It would not be a useful application of *Bostock* to flip her sex to male, but take away the fact that she was seeking to access IUI and IVF treatments by establishing that she met the [m]edical [p]lan's definition of infertility.").)

[7] Assuming sexual orientation is a binary concept (*i.e.*, one is attracted to either men or women, but not both or neither), flipping the sex of a plaintiff and keeping fixed her attraction also literally flips the sexual orientation of the person. Here, for example, flipping Kulwicki's sex from female to male while keeping her attraction to women constant seems to switch her sexuality from homosexual to heterosexual. *Cf. Skrmetti*, 605 U.S. at 521–22 (acknowledging changing one's sex and keeping attraction constant "automatically switches" the person's sexual orientation). This hypothetical thus appears to swap two variables: sex and sexual orientation. But this seems more like a nominal quirk of the but-for test and the product of switching characteristics defined by the relationship between two sexes (as opposed to a suggestion that courts may intentionally change several features at a time). And no one seems to suggest these secondary changes allow courts to flip several things at once.

hypothetical male Kulwicki himself is no longer seeking personal infertility treatments; instead, his female *spouse* now seeks the benefits. In other words, the hypothetical quietly shifts the focus away from how Plaintiff *herself* may access the benefits for *her* own infertility. That second, independent swap is a complete alteration of Plaintiff and effectively nullifies the entire purpose of the analysis. Rather than comparing how a male Kulwicki and Kulwicki herself would each fare under the plan, this hypothetical compares the experiences of two women—Kulwicki and the hypothetical woman married to the male Kulwicki—thus simply flipping the sex of some irrelevant person.

Citing *Lange v. Houston Cnty.*, 152 F.4th 1245, 1252 (11th Cir. 2025), however, the Magistrate Judge explained the Eleventh Circuit's recent application of *Bostock* contemplates this shift to the dependent's treatment because "it looked to the anatomically-correct, opposite-gender dependent of the flipped person." (Dkt. 50 at 16–17.) Fair enough, the Eleventh Circuit in *Lange* applied *Bostock* and contrasted a transgender plaintiff's lack of coverage with the lack of coverage for a person of the opposite sex who seeks the "same" sex change, "perhaps for a male dependent." *Lange*, 152 F.4th at 1252. The Court has no reason to doubt

a person may show discrimination by pointing to differential treatment based on the benefits the spouse of a person receives. But again, that scenario has no application in this case. As explained above, the claims arise only from the plan's differential treatment of Plaintiff and the putative class who *personally* sought treatment, not the differential treatment of their spouses; nothing in *Lange* suggests courts can always construct a hypothetical based on a dependent spouse's treatment, regardless of the pleaded claim

As the final blow, the scenario changes another thing along the way: Plaintiff's inability to "conceive a child by engaging in sexual intercourse." (Dkt. 46 ¶¶ 13, 23.) The Magistrate Judge's second scenario switches this fact, making the hypothetical male Kulwicki's spouse capable of "conceiv[ing] a child by engaging in sexual intercourse." (*See, e.g.*, Dkt. 48 at 10 ("Lesbian women cannot engage in the former (unprotected sexual intercourse with a man) and must therefore pay out-of-pocket for artificial insemination to be eligible for fertility coverage. If a lesbian woman's sex is 'flipped' and she becomes a man, however, the barrier to accessing fertility benefits disappears.").) But that loads the dice. This is one of the most important characteristics of Plaintiff and,

according to her, is *the* reason she believes the plan discriminates. (*See* Dkt. 46 ¶¶ 23 ("Kulwicki cannot meet the plan's definition of infertility by having 'timed, unprotected heterosexual coitus' because she is a lesbian woman."), 25, 28–31, 49, 59.) As a result, it makes little sense to also switch her ability to have procreative sex, particularly because her male counterpart (perhaps because he had a debilitating accident or some other biological condition) could share that same characteristic. So even if the Court were to switch both Kulwicki's sex and the recipient of fertility treatments to her hypothetical spouse, the proper comparison would be a hypothetical male Kulwicki who (for whatever reason) cannot have procreative sex and seeks fertility treatment for a female dependent. In this case, the hypothetical Kulwicki would be in the *same* spot as the real Kulwicki, only able to access benefits after paying for failed cycles of artificial insemination for his spouse. And this exposes the causal link—Kulwicki cannot access benefits because she cannot have procreative sex, a characteristic not unique to women or lesbians. Title VII does not protect against that type of differential treatment. The

Court thus rejects the Magistrate Judge's conclusion that the second scenario shows discrimination on the basis of sex.[8]

### 2. The Court's Application of *Bostock*

The Court now runs this case through *Bostock's* but-for test, with particular attention to the Eleventh Circuit's recent engagement with the test in *Lange*. In that case, the plaintiff (a transgender woman), sought insurance coverage for "a male-to-female sex change surgery" through her employer's policy, which excluded coverage for the procedure. *Lange*, 152 F.4th at 1249–50. The plaintiff sued, asserting a Title VII facial discrimination claim based on sex and transgender status. *Id.* at 1250. The plaintiff argued (among other things) that the plan discriminates on the basis of sex "because it would have covered the requested surgery if

[8] The R&R also cites two other unpublished district court decisions finding a similar medical plan discriminatory under the Affordable Care Act's anti-discrimination provisions: *Berton v. Aetna Inc.*, 2024 WL 869651 (N.D. Cal. Feb. 29, 2024) and *Murphy v. Health Care Serv. Corp.*, 2023 WL 6847105 (N.D. Ill. Oct. 17, 2023). Those decisions don't bind the Court. *Georgia v. President of the United States*, 46 F.4th 1283, 1304 (11th Cir. 2022) ("[A] district court's decisions do not bind other district courts[.]"). Nor do those decisions persuade the Court because neither seriously engages with *Bostock*'s command to change one thing at a time—the person's sex—to tell if the plan treats the hypothetical *individual* better. The Court declines to follow those cases.

[the plaintiff] were born a female and denied coverage only because [the plaintiff] was born a male." *Id.* at 1251. The court disagreed and found no sex-based differential treatment. *Id.* at 1251–52. Applying *Bostock*'s test, the court flipped the plaintiff's biological sex from male to female and found the policy would still exclude coverage, regardless of whether it considered sex change procedures as a broad category or if it "consider[ed] the specific procedures that were part of [the plaintiff's] sex change surgery." *Id.* at 1252. The plan would deny coverage, the court reasoned, even if the plaintiff "were a natal woman who sought coverage for the same male-to-female sex change that [the plaintiff] received (perhaps for a male dependent)." *Id.* at 1252 (emphasis added). The plan would also deny coverage, the court explained, even if it "consider[s] the specific procedures that were part of [the plaintiff's] sex change surgery" because some of them "would be impossible for a person with female anatomy to undergo" and "others would be denied to both natal men and women as part of a sex change," for example if a natal woman sought the procedure "to reverse a previous female-to-male sex change." *Id.* at 1252.

The but-for analysis in *Lange* provides three lessons, each of which informs the Court's reasoning. First, a court must *only* flip the sex of the

plaintiff under *Bostock*. *See id.* at 1252 ("Let's change 'one thing' and assume [the plaintiff] were a natal woman instead of a natal man: would the insurance policy have covered any of those procedures as part of a sex change? Again, the answer is no."). Second, *Lange* implicitly recognizes that courts should keep constant the specific details about the person—down to the "specific procedures" a person seeks—when running the but-for test. *Id.* at 1252 ("we consider the specific procedures that were part of Lange's sex change surgery"). Finally, and perhaps most importantly, the "impossib[ility]" of a hypothetical person's ability to obtain the specific treatment does not suggest a flawed comparator. *Id.* at 1252. The court in *Lange*, for example, did not treat the anatomical impossibility of a natal woman having male-to-female surgery as miscasting the hypothetical person. Rather, it found that impossibility part of the reason the policy did not discriminate on the basis of sex. *Id.* (explaining "[s]ome of those procedures would be impossible for a person with female anatomy to undergo," and concluding "sex is simply not a but-for cause").

Those teachings make plain the proper *Bostock* analysis. Again, Plaintiff is a female attracted to females seeking to access intrauterine

insemination and invitro fertilization for herself. Change her sex to male, keep all else the same, and she becomes a male seeking access to intrauterine insemination and invitro fertilization for himself. Would the plan treat the hypothetical male better in the way she alleges? No. As a man, she would not receive that treatment. And, as discussed, Plaintiff has not plausibly alleged that a man would have access to any fertility treatments. Isolating sex as the dependent variable does not place Plaintiff in a better situation. In other words, the *Bostock* test shows "sex is simply not a but-for cause" of any differential treatment. *Id.* Rather than switching other circumstances about Plaintiff to see if the plan discriminates against someone for other reasons, the Court stops there.

Plaintiff makes several counterarguments, but none persuades the Court. First, she points to an example in *Lange* where the Eleventh Circuit suggested a plan requiring "transgender employees [to] pay more than nontransgender employees" would facially discriminate based on transgender status. (Dkt. 53 at 12–13 (quoting *Lange*, 152 F.4th at 1253).) She believes her case falls neatly within this example because "[l]esbian employees must pay more than male employees (or heterosexual female employees, or heterosexual female covered spouses

of male employees) to gain access to the same fertility benefits." (*Id.* at 13.) But, as explained, the proper male comparator for Plaintiff—a male with the inability to "conceive a child by engaging in sexual intercourse"—would have to pay to receive fertility benefits just the same as her. While someone who can engage in procreative sexual intercourse might pay less, the difference does not lie in that person's gender or sexual orientation but rather their ability to conceive through sexual intercourse. And because the inability to have procreative sex is not unique to women or lesbians, differentiation on that basis is not a proxy for sex (or sexual orientation) discrimination.[9]

Second, conceding that a pure sex-flip of Plaintiff "leads to the inescapable conclusion that Plaintiff would not be subjected to the policy she complains" about, Plaintiff believes the Court should create "the

---

[9] Even if the *Bostock* test is not a threshold issue for Plaintiff's disparate impact claim (Count II), that claim would fail for this reason. That claim requires Plaintiff to "demonstrate that a challenged employment action or practice has a disproportionate adverse impact on a category of persons protected by the statute." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1117 (11th Cir. 1993). The group disparately impacted by Defendants' policy, if any, are those unable to naturally procreate. That includes both men and women of all sexualities and is not a protected class under Title VII.

next-closest analogue that allows for an all-fours comparison of how the challenged policy affects the plaintiff." (Dkt. 53 at 8–9.) As best the Court can tell, she believes *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983) and *Lange* support this "variation of the *Bostock* test." (*Id.* at 9–14.) The Court disagrees for several reasons. In *Newport News*, the Supreme Court considered whether an insurance plan discriminated against a male employee on the basis of sex by "provid[ing] limited pregnancy-related benefits for employees' wives, and afford[ing] more extensive coverage for employees' spouses for all other medical conditions requiring hospitalization." 462 U.S. at 683. It found the plan did. *See id.* at 683–85. In doing so, it compared the benefits available to a spouse of the male employee and a hypothetical female employee with a male spouse and reasoned the "plan unlawfully gives married male employees a benefit package for their dependents that is less inclusive than the dependency coverage provided to married female employees." *See id.* at 683–84. And when implicitly doing the "simple [but-for] test," the Supreme Court flipped both the plaintiff's sex and the sex of his spouse because "the sex of the spouse is always the opposite of the sex of the employee." *See id.* at 683–84.

Setting aside the glaring factual distinctions (such as the discrimination there occurring under the Pregnancy Discrimination Act), the Court does not read the analysis in *Newport News* as a nod to this "next-closest analogue" variation. As Plaintiff recognizes (Dkt. 53 at 10), "same-sex marriages were not legally recognized" during the 1980s when the Supreme Court issued *Newport News*. *See, e.g.*, *Bowers v. Hardwick*, 478 U.S. 186 (1986) (statute criminalizing same-sex intercourse or relationship). The Supreme Court thought it had to flip the spouse's sex once it flipped the plaintiff's sex because any other variation would probably violate the law. Since it is no longer true that "the sex of the spouse is always the opposite of the sex of the employee," this so-called added "flip" is no longer necessary.

Next, the excerpt Plaintiff cites from *Lange* does not show the Eleventh Circuit "adjust[ing] the flip test to make it useful in the scenario presented" by looking to "the anatomically-correct, opposite-gender dependent of the flipped person' *even though* the gender-flipped individual could not personally undergo the procedure at issue" as Plaintiff claims. (Dkt. 53 at 13–14 (emphasis in original).) Just the opposite. The Eleventh Circuit used the same approach the Court uses

in this case. *See Lange*, 152 F.4th at 1252 ("Let's change 'one thing' and assume Lange were a natal woman instead of a natal man: would the insurance policy have covered any of those procedures as part of a sex change? Again, the answer is no."). And as the *Lange* court made clear, it found no discrimination even when looking at the "specific procedures that were part of [the plaintiff's] sex change surgery" *because* (1) "[s]ome of those procedures would be impossible for a person with female anatomy to undergo" and (2) "others would be denied to both natal men and natal women." *Id.* at 1252. Likewise, even within this second category, the *Lange* court focused on whether the hypothetical opposite-gender plaintiff would *personally* receive the procedure and did not simply (in Plaintiff's words) look to the "anatomically-correct, opposite-gender dependent." It kept constant the very fact that the plaintiff sought the procedure for herself. *Id.* at 1252.[10] So even in this example,

[10] Plaintiff's argument on this point is far from clear. But to the extent she means this example shows the Eleventh Circuit flipping two things at a time (*i.e.*, the plaintiff's sex *and* the specific type of procedure), the Court rejects it because *Lange* looked at whether the plan would cover the same procedure—(among other things) the creation of a "neovagina" for the hypothetical person, albeit as a reversal of a sex change rather than the initial sex change.

the circuit looked at the individual—not some freestanding, imaginary other person, like a spouse of the individual—to decide whether that person would seek the particular kind of sex-change surgery.

## III. Conclusion

The Court **SUSTAINS** Defendants' objections (Dkt. 52), **REJECTS** the R&R (Dkt. 50), **GRANTS** Defendants' motion to dismiss (Dkt. 47), **DISMISSES** Plaintiff's claims, and **DISMISSES WITHOUT PREJUDICE** the putative class claims.[11] The Court **DIRECTS** the Clerk to close this case.

**SO ORDERED** this 25th day of September, 2026.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

[11] The Court does not give leave to amend because it has already given it once after a hearing (Dkt. 44) and she doesn't ask for another chance. *See Newbauer v. Carnival Corp.*, 26 F.4th 931, 936 (11th Cir. 2022).